IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------x
                                                               :
In re                                                          : Chapter 11
                                                               :
Fairfield Residential LLC, *et al.*,[1]                        : Case No. _____ (_____)
                                                               :
         Debtors.                                              : (Jointly Administered)
                                                               :
---------------------------------------------------------------x

<u>APPLICATION OF DEBTORS AND DEBTORS IN POSSESSION,
PURSUANT TO SECTIONS 327(a) AND 328(a) OF THE BANKRUPTCY
CODE, BANKRUPTCY RULE 2014(a) AND LOCAL BANKRUPTCY RULE 2014-1,
FOR AN ORDER AUTHORIZING THEM TO EMPLOY AND RETAIN
IMPERIAL CAPITAL, LLC AS FINANCIAL ADVISORS AND INVESTMENT
BANKERS *NUNC PRO TUNC* TO THE PETITION DATE AND TO WAIVE THE
INFORMATION REQUIREMENTS OF LOCAL BANKRUPTCY RULE 2016-2(d)</u>

The above-captioned debtors and debtors in possession (collectively, the

"Debtors") hereby apply to the Court for entry of an order, substantially in the form attached

hereto as Exhibit A, authorizing the Debtors to retain and employ Imperial Capital, LLC

("Imperial") as financial advisors and investment bankers, *nunc pro tunc* to the Petition Date (as

defined herein). In support of this application (the "Application"), the Debtors: (a) submit (i)

the Affidavit of Eric Carlson (the "Carlson Affidavit"), a copy of which is attached hereto as

---

[1] The Debtors are the following 15 entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): Fairfield Residential LLC, a Delaware limited liability company (8277), Fairview Homes, Inc., a Delaware corporation (9930), FF Development L.P., a Delaware limited partnership (2310), FF Properties L.P., a Delaware limited partnership (5355), Fairview Residential LLC, a Delaware limited liability company (5416), FF Realty LLC, a Delaware limited liability company (5941), Fairfield Financial A LLC, a Delaware limited liability company (7014), FF Investments LLC, a Delaware limited liability company (7066), Fairview Investments LLC, a Delaware limited liability company (9605), Fairfield Affordable Housing LLC, a Delaware limited liability company (7111), FF Development, Inc., a Delaware corporation (2308), FF Properties, Inc., a Delaware corporation (5354), Fairview Residential L.P., a Delaware limited partnership (9788), Fairview Residential WA LLC, a Delaware limited liability company (9703) and Fairview Residential CA L.P., a Delaware limited partnership (9972). The mailing address of each of the Debtors is 5510 Morehouse Drive, Suite 200, San Diego, California 92121

Exhibit B and incorporated herein by reference and (ii) the Affidavit of Andrew Hinkelman in Support of First Day Motions (the "Hinkelman Affidavit") filed on the Petition Date and incorporated by reference and (b) further respectfully represent as follows:

**Background**

1. On December 13, 2009 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2. Contemporaneously with the filing of this Motion, the Debtors filed a motion seeking joint administration of their chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). To date, no trustee or official committee of unsecured creditors has been appointed by the Office of the United States Trustee.

3. Fairfield Residential LLC ("FFR") is a fully integrated multifamily housing company that through its various subsidiaries provides a diverse mix of services to a wide range of investors, joint venture partners and clients. In addition, FFR either directly or indirectly, acts as a general partner or managing member of, and owns varying stakes in, a number of project level operating companies, none of which is a debtor in these chapter 11 cases. In total, the Debtors, along with wholly owned and certain non-wholly owned non-debtor subsidiaries (collectively, with the Debtors, the "Company") have an interest in approximately 200 separate multifamily properties in stages varying from "raw land," to under construction and finally to fully operational new construction and redevelopment communities.

4. With approximately 2,000 employees, the Company currently operates in 40 diverse markets across the United States, including Boston, Massachusetts; Washington,

2

D.C.; Charlotte, North Carolina; Atlanta, Georgia; Dallas, Texas; Denver, Colorado; Las Vegas, Nevada; Phoenix, Arizona; Los Angeles, California; San Francisco, California; and Seattle, Washington. For 2008, the Company had total revenues of $952.9 million and $107.5 million in net losses. As of December 31, 2008, the Company had approximately $1.2 billion in total assets and approximately $978 million in total liabilities, exclusive of approximately $3 billion of contingent guaranty liabilities. Additional information regarding the Company's financial performance and debt situation is set forth in the Affidavit of Andrew Hinkelman in Support of First Day Pleadings (the "Hinkelman Affidavit").

5. The Company was built around providing a core group of complementary services to its investors and customers, including:

> ***Development and New Construction*** – Relying upon a skilled team of professionals, the Company is one of the largest developers and builders of market rate and affordable multifamily apartment home properties, as well as student housing properties and for-sale condominium homes. Since inception in late 1997, the Company has started over 200 new construction projects consisting of over 68,000 attached homes and representing approximately $8.5 billion in total project costs.
>
> ***Acquisitions and Redevelopment*** – As a core element of its strategy, the Company has a well-defined program of acquiring and redeveloping multifamily properties in markets that are either supply-constrained or in which redevelopment costs are substantially below new construction costs. In addition, the Company has had a strategy focused on acquiring properties in markets that appear to be emerging from economic displacement. Since 1997, the Company has acquired nearly 300 properties, consisting of almost 78,000 attached homes and representing approximately $8.2 billion in project costs.
>
> ***Affordable Housing*** – Since its inception, the Company has been developing, building, redeveloping and managing affordable and workforce housing. The Company is an experienced authority in the intricacies of using Low Income Housing Tax Credits (LIHTCs) and tax exempt municipal bonds to finance affordable apartment homes communities.
>
> The Company has created/ managed over 12,000 affordable

3

apartment homes in over 100 properties throughout the U.S. including almost 6,400 apartment homes in 28 properties financed through Low Income Housing Tax Credits.

*Property Management* – The Company is also one of the largest, full service property management companies in the United States and was ranked by the National Multi Housing Council as the 11th largest apartment manager and 17th largest apartment owner in the country as of year end 2008. As of November 1, 2009, the Company managed over 55,000 apartment homes in new construction, stabilized, turnaround properties and fee-managed properties.

*Asset Management and Disposition* – The Company's internal Asset Management group is responsible for the execution and monitoring of the full business plan of an asset, from the point of acquisition to the sale and realization of the maximum value of the asset and, in turn, the returns to investors. The Company maintains an in-house sales team that, in conjunction with selected brokerage firms, markets and sells properties to maximize the return to the Company's investors.

Since inception, including assets in which it had an ownership interest and those in which it did not, the Company has sold over 360 properties totaling more than 102,000 attached homes for a sales value in excess of $11.7 billion.

6. Historically, the Company's diverse business lines have allowed the Company to pursue a wide range of opportunities and to respond quickly to changes in the real estate and finance markets. Because the multifamily development, construction, lease-up and asset disposition cycles have been complementary, the Company has been able to include each of its business units as part of a comprehensive group of services to its investors focusing on investment profitability.

7. Needless to say, the chaos in the domestic and international real estate and finance markets has had a deleterious effect on FFR and each of its operating businesses. While the demand for multifamily homes remains generally strong and FFR's operating businesses continue to perform well, the Company has become ensnared in the collapse of the real estate finance markets. The unprecedented shuttering of these markets has prevented the Company

4

from refinancing its significant debt that has matured (or will shortly mature) and has choked off the market for potential purchasers of the Company's properties.

8. In late 2008, the Company recognized the need to restructure its parent-level debt and began working with the lenders at FFR on an individual basis. By early 2009, those negotiations came to include, both on an individual basis and, later, through a steering committee of project lenders (the "Steering Committee"), those lenders at the non-debtor project level entities who hold contingent guarantees from certain of the other Debtors. These efforts continued throughout 2009, and recently concluded with the Debtors reaching agreement with their core creditor constituencies on the framework of a consensual plan of reorganization that should allow the Debtors to emerge from chapter 11 during early 2010, as one of the leading multifamily home operating companies.

## Jurisdiction

9. This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

10. The statutory predicates for the relief requested herein are sections 327(a) and 328(a) of title 11 of the United States Code (the "Bankruptcy Code"), rules 2002, 2014(a) and 2016 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and rule 2014-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

## Relief Requested

11. The Debtors respectfully request the entry of an order authorizing them to retain and employ Imperial Capital, LLC ("Imperial") as financial advisor and investment banker to the Debtors in these chapter 11 cases, *nunc pro tunc* to the Petition Date, subject to further

5

LEGAL_US_W # 62352060 9
RLF1 3515697v 1

order of the Court, in accordance with the terms of that certain letter agreement (the "Engagement Letter"), dated March 9, 2009, as modified by that certain letter agreement, dated August 11, 2009 (the "Amendment" and, together with the Engagement Letter, the "Agreement"), copies of which are attached hereto as Exhibit C and incorporated by reference herein.[2]

## Imperial's Qualifications

12. The Debtors seek to retain Imperial as their investment banker and financial advisor because Imperial is recognized for its expertise in providing financial advisory services in financially distressed situations, including advising debtors, creditors and other constituents in chapter 11 proceedings. Imperial is also uniquely qualified to be retained as an investment banker and financial advisor in these chapter 11 cases given its knowledge of the Debtors' business and financial affairs.

13. Imperial provides high level strategic assessments; assists in the development and presentation of business plans; and assists in developing and implementing financial restructuring plans both in and out of court. Imperial also provides capital raising and M&A advisory services for both healthy and financially distressed clientele.

14. Imperial has considerable experience with Chapter 11 restructuring and other distressed company situations, advising both debtor and creditor client constituencies. Advisory assignments in which Imperial has been actively involved include, among others: Monaco Coach Corp., Aloha Airlines, Custom Food Products, LandSource, Movie Gallery, Resorts Atlantic City, Nellson Nutraceutical, GPX, Pierre Foods, Performance Transportation

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Agreement. The summary of the terms of the Agreement contained herein is provided for the benefit of the Court and parties in interest and, to the extent the summary set forth herein and the terms of the Agreement are inconsistent, the terms of the Agreement shall control.

Systems, Werner Ladder, Leiner Health Products, TIC Holdings, Brotman Medical Centers, Greektown Casino, Hawaiian Airlines, Mesaba Airlines and Synventive Molding.

15. On March 9, 2009, the Debtors retained Imperial to serve as their financial advisor and investment banker in connection with their restructuring efforts. In preparation for these chapter 11 cases, Imperial, among other things, has: (a) analyzed the Debtors' business, operations, properties, financial condition, competition, forecast, prospects and management; (b) assisted the Debtors in evaluating their strategic alternatives; (c) assisted the Debtors in communications and negotiations with their constituents, including creditors, employees, vendors, shareholders and other parties-in-interest, including participants in the restructuring, in connection with the restructuring; (d) assisted the Debtors in negotiating prepetition forbearance agreements with existing lenders; (e) assisted the Debtors in the preparation of solicitation materials with respect to a potential financing; and (f) identified and assisted the Debtors in communications with potential financing partners.

16. As a result of this prepetition work performed on behalf of the Debtors, Imperial acquired significant knowledge of the Debtors and their businesses and is now intimately familiar with the Debtors' financial affairs, debt structure, operations and related matters. Likewise, in providing prepetition services to the Debtors, Imperial's professionals have worked closely with the Debtors' management and other professionals. Accordingly, Imperial has developed relevant experience and expertise regarding the Debtors that will assist Imperial in providing effective and efficient services in these cases.

### Services to Be Provided

17. Pursuant to the Agreement, the Debtors anticipate that Imperial may provide the following services:

7

(a) analysis of the Debtors' business, operations, properties, financial condition, competition, forecast, prospects and management;

(b) financial valuation of the ongoing operations of the Debtors; provided that Imperial shall not be engaged to appraise or value individual properties owned by the Debtors;

(c) assisting the Debtors in developing, evaluating, structuring, negotiating and implementing the terms and conditions of a potential plan of reorganization ("Plan"), including the value of the securities, if any, that may be issued to certain creditors and/or the equity holders under the Plan;

(d) assisting the Debtors in the preparation of solicitation materials with respect to any securities to be issued in connection with the Debtors' restructuring efforts;

(e) assisting the Company in the preparation of solicitation materials with respect to the Financing (as defined in the Engagement Letter);

(f) assisting the Debtors with the design of any debt or equity securities or consideration to be issued in conjunction with the Debtors' restructuring efforts;

(g) assisting the Debtors in communications and negotiations with its constituents, including creditors, employees, vendors, shareholders and other parties-in-interest, including participants in the Plan, in connection with the Plan;

(h) identification of, and assisting the Debtors in negotiations with qualified participants in the Financing;

(i) providing the Company and its Executive Committee with periodic updates regarding the restructuring and the Financing; and

(j) providing such other financial advisory services with respect to the Debtors' financial issues as may from time to time be agreed upon between the Debtors and Imperial.

18. The Agreement also contains standard indemnification language with respect to Imperial's services. The Debtors, however, shall have no obligation to indemnify Imperial, or provide contribution or reimbursement to Imperial, for any claim or expense that is either: (i) judicially determined (the determination having become final) to have arisen from Imperial's gross negligence, willful misconduct, breach of fiduciary duty, if any, bad faith or

8

self-dealing; (ii) for a contractual dispute in which the Debtors allege the breach of Imperial's contractual obligations, unless the Court determines that indemnification, contribution or reimbursement would be permissible pursuant to In re United Artists Theatre Company, et al., 315 F.3d 217 (3d Cir. 2003); or (iii) settled prior to a judicial determination as to Imperial's gross negligence, willful misconduct, breach of fiduciary duty, or bad faith or self-dealing but determined by this Court, after notice and a hearing to be a claim or expense for which Imperial should not receive indemnity, contribution or reimbursement under the terms of the Agreement as modified by the terms of the Order. Accordingly, as part of this Application, the Debtors request that the Court approve the indemnification provisions as set forth therein as modified by the above language.

## Professional Compensation

19. Imperial intends to apply for compensation for professional services rendered in connection with Imperial's chapter 11 cases, subject to Court approval and in compliance with applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules and any other applicable procedures and orders of the Court, consistent with the proposed compensation structure summarized below and set forth in detail in the Agreement (the "Fee Structure")[3]:

(a) Monthly Fees. A financial advisory fee of $150,000 per month (the "Monthly Fees") shall be payable in advance on the 9th of each month.

(b) Restructuring Transaction Fee: A transaction fee of $4,000,000 (the "Restructuring Transaction Fee") shall be payable in cash by wire upon the closing of the Restructuring (as defined in the Agreement).

---

[3] Contemporaneously herewith, the Debtors are seeking to establish procedures for interim compensation of their professionals. As discussed in more detail below, the Debtors are seeking to retain Imperial under section 328(a) of the Bankruptcy Code, and, thus, the Debtors believe that Imperial's compensation should not be subject to any additional standard of review under section 330 of the Bankruptcy Code

(c) <u>Financing Transaction Fee(s)</u>: A cash fee (the "<u>Financing Transaction Fee</u>") payable out of the proceeds of the Financing (as defined in the Engagement Letter) by wire in the event the Debtors consummate a Financing or series of Financings (x) in an amount up to $85 million, the Financing Transaction Fee shall equal two-thirds (2/3) of the following; (a) 2.0% of the face amount of any secured debt sold or arranged as part of the Financing, (b) 4.0% of the face amount of any unsecured debt sold or arranged as part of the Financing and (c) 5.5% of the face amount of any equity securities sold or arranged as part of the Financing or (y) in an amount equal to or in excess of $85 million, the Financing Transaction Fee shall be $4,000,000. In the event that any of the debt or equity sold or arranged as part of the Financing is purchased by California State Teachers Employees' Retirement System (together with its affiliates "<u>CalSTRS</u>"), in calculating the Financing Transaction Fee, one hundred percent (100%) of debt or equity purchased by CalSTRS shall be credited against the amount of total debt or equity placed in determining the Financing Transaction Fee set forth in this paragraph.

(d) In addition to the fees described above, and without regard to whether any Restructuring or Financing occurs or the Agreement expires or is terminated, all fees, disbursements and out-of-pocket expenses (the "<u>Expenses</u>") incurred by Imperial in connection with the services to be rendered (including, without limitation, reasonable attorneys' fees, travel and lodging expenses, word processing charges, messenger services, duplicating services, facsimile expenses and other customary expenditures) shall be reimbursed to Imperial, or paid on behalf of Imperial, promptly as billed, subject to the procedures set forth in the Bankruptcy Code, Bankruptcy Rules, the Local Rules and any other applicable orders of this Court.

20. The Fee Structure is consistent with Imperial's normal and customary billing practices for comparably sized and complex cases, both in- and out-of-court, involving the services to be provided in these chapter 11 cases. The Fee Structure set forth in the Agreement and generally described above also is consistent with and typical of arrangements entered into by other investment banking and financial advisory firms of comparable standing in connection with the rendering of similar services to clients such as the Debtors. Imperial and the Debtors believe that the Fee Structure is both reasonable and market-based. In determining the level of compensation to be paid to Imperial and the reasonableness thereof, the Debtors

LEGAL_US_W # 62352060.9
RLF1 3515697v.1

compared Imperial's fee proposal to other competing proposals received by the Debtors in the investment banking selection process.

21. The Debtors acknowledge and agree that Imperial's restructuring and recapitalization expertise, as well as its significant experience in valuation and expert services in connection with plan confirmation, were important factors in determining the amount of the Fee Structure and that the ultimate benefit to the Debtors of Imperial's services likely could not be measured merely by reference to the number of hours to be expended by Imperial's professionals in the performance of such services. To induce Imperial to do business with the Debtors in bankruptcy, the compensation structure described above was established to reflect the difficulty of the extensive assignments Imperial expects to undertake and the potential for an unfavorable outcome as a result of factors outside of Imperial's control.

22. To date, Imperial has received $1,800,000 from the Debtors on account of Monthly Fees and $225,000 for Expenses, inclusive of deposit amounts. As of December 11, 2009, Imperial holds a cash deposit against Expenses (the "Deposit") of $21,254.87, to be applied against future Expenses before additional reimbursement is requested. As of the Petition Date, Imperial did not hold a prepetition claim against the Debtors for services rendered.

23. Imperial has not shared or agreed to share any of its compensation from the Debtors with any other person, other than other principals and employees of Imperial, as permitted by section 504 of the Bankruptcy Code.

24. After the Petition Date, Imperial will seek all compensation in accordance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules and orders of the Court. As discussed below, Imperial's compensation should be subject to the standard of review of section 328(a) of the Bankruptcy Code, the Bankruptcy Rules and

11

applicable local rules and orders and not subject to any additional standard of review under section 330 of the Bankruptcy Code.

### Request for Waiver of Local Rule 2016-2(d)

25. In light of the Fee Structure and general industry practice, the Debtors, along with Imperial, request a partial waiver of the information requirements for compensation requests set forth in Local Rule 2016-2(d) pursuant to Local Rule 2016-2(g). It is not the general practice of investment banks to keep detailed time records similar to those customarily kept by attorneys and Imperial has no process in place to record or maintain such records. Therefore, the Debtors respectfully request that they be permitted to record professionals' time usage in hourly increments.

### No Duplication of Services

26. The Debtors intend that Imperial's services will complement, and not duplicate, the services to be rendered by MJC Advisors LLC, FTI Consulting, Inc., Ernst & Young LLP, Paul, Hastings, Janofsky & Walker LLP, Richards, Layton & Finger, P.A., Procopio, Cory, Hargreaves & Savitch LLP or any other professional retained in these chapter 11 cases. Pursuant to the Agreement, Imperial understands that the Debtors have retained and may retain additional professionals during the term of the engagement and agrees to work cooperatively with such professionals to integrate any respective work conducted by the professionals on behalf of the Debtors.

### Imperial's Disinterestedness

27. To the best of the Debtors' knowledge, information, and belief and based upon the Carlson Affidavit, Imperial is a "disinterested person" as defined by section 101(14) of the Bankruptcy Code.

12

28. As described in detail in the Carlson Affidavit, Imperial has, among other things, searched its client databases to determine whether it represents, or has represented, certain of the Debtors' creditors or other parties in interest in these proceedings, and/or matters wholly unrelated to these proceedings. However, Imperial may have represented certain of the Debtors' creditors or other parties in interest in matters wholly unrelated to these Chapter 11 cases. Except as may be described in the Carlson Affidavit, Imperial does not, to its knowledge, represent any party with an interest materially adverse to the Debtors or their estates.

## Basis for Relief

**A. The Debtors Should be Permitted to Retain and Employ Imperial on the Terms in the Agreement Pursuant to Section 328 of the Bankruptcy Code.**

29. The Debtors seek approval of the Fee Structure and Expenses pursuant to section 328(a) of the Bankruptcy Code, which provides, in relevant part, that the Debtors "with the court's approval, may employ or authorize the employment of a professional person under section 327 ... on any reasonable terms and conditions of employment, including on a retainer ...." 11 U.S.C. § 328(a). Consequently, section 328(a) of the Bankruptcy Code permits the Court to approve the terms of Imperial's engagement as set forth in the Agreement, including the Fee Structure and indemnification provisions.

30. Section 328 of the Bankruptcy Code permits the compensation of professionals, including investment bankers and financial advisors who, among other things, serve as testifying experts, on more flexible terms that reflect the nature of their services and market conditions. As the United States Court of Appeals for the Fifth Circuit has recognized:

> Prior to 1978 the most able professionals were often unwilling to work for bankruptcy estates where their compensation would be subject to the uncertainties of what a judge thought the work was worth after it had been done. That uncertainty continues under the present § 330 of the Bankruptcy Code, which provides that the court award to professional consultants "reasonable compensation"

13

> based on relevant factors of time and comparable costs, etc. Under present § 328 the professional may avoid that uncertainty by obtaining court approval of compensation agreed to with the trustee (or debtor or committee).

In re National Gypsum Co., 123 F.3d 861, 862 (5th Cir. 1997) (internal citations omitted).

31. Furthermore, under the recently enacted Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, certain modifications were made to section 328(a) of the Bankruptcy Code, which now provides as follows:

> The trustee, or a committee appointed under section 1102 of this title, with the court's approval, may employ or authorize the employment of a professional person under section 327 or 1103 of this title, as the case may be, on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, <u>on a fixed percentage fee basis, or on a contingent fee basis</u>.

11 U.S.C. § 328(a) (emphasis added). Section 328(a) of the Bankruptcy Code, as amended, now makes clear that debtors may retain, subject to bankruptcy court approval, a professional on a fixed-fee basis such as the Fee Structure with Imperial as proposed by the Debtors herein.

32. As set forth above, notwithstanding approval of the Agreement under section 328 of the Bankruptcy Code, Imperial intends to apply for compensation for professional services rendered and reimbursement of expenses incurred in connection with the Debtors' chapter 11 cases, subject to the Court's approval and in compliance with applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules and any other applicable procedures and orders of the Court and consistent with the Fee Structure set forth in the Agreement. The Fee Structure appropriately reflects the nature and scope of services to be provided by Imperial and Imperial's substantial experience with respect to going concern valuation and expert testimony services, and are consistent with the fee structures typically utilized by Imperial and other leading financial advisors, who do not bill their clients on an hourly basis.

14

LEGAL_US_W # 62352060.9
RLF1 3515697v.1

33. Indeed, similar fixed and contingency fee arrangements in other large chapter 11 cases have been routinely approved and implemented by courts in this circuit. See, e.g., In re Monaco Coach Corp., No. 09-10750 (KJC) (Bankr. D. Del. Apr. 9, 2009); In re Tropicana Entm't, LLC, No. 08-10856 (KJC) (Bankr. D. Del. May 30, 2008); In re Leiner Health Prods., Inc., No. 08-10446 (KJC) (Bankr. D. Del. April 8, 2008); In re FLYi, Inc., No. 05-20011 (MFW) (Bankr. D. Del. Dec. 5, 2005); In re Foamex Int'l, Inc., No. 05-12685 (PJW) (Bankr. D. Del. Oct. 18, 2005); In re Oakwood Homes Corp., No. 02-13396 (PJW) (Bankr. D. Del. July 21, 2003); In re United Artists Theatre Co., No. 00-3514 (SLR) (Bankr. D Del. Dec 1, 2000).[4]

34. Additionally, the terms and conditions of the Agreement, including the provisions relating to indemnification, were negotiated by the Debtors and Imperial at arm's-length and in good faith. In light of the foregoing, and given the numerous issues that Imperial may be required to address in the performance of its services hereunder, Imperial's commitment to the variable level of time and effort necessary to address all such issues as they arise and the market prices for Imperial's services for engagements of this nature, the Debtors believe that the terms and conditions of the Agreement are fair, reasonable and market-based under the standards set forth in section 328(a) of the Bankruptcy Code.

35. Indeed, the Debtors and Imperial submit that the indemnification provision in the Agreement is: (a) a standard provision, both in and outside of chapter 11 cases; (b) reflects the qualifications and limits on the indemnification provisions that are customary in Delaware and other jurisdictions; (c) viewed in conjunction with the other terms of Imperial's proposed retention, is reasonable and in the best interests of the Debtors' estates, creditors and all

---

[4] Because of the voluminous nature of the orders cited herein, they are not attached to this Application Copies of these orders are available on request of the Debtors' counsel.

parties in interest; and (d) consistent with provisions regularly approved by courts in this and other districts under circumstances similar to these. See, e.g., In re Monaco Coach Corp., No. 09-10750 (KJC) (Bankr. D. Del. Apr. 9, 2009); In re FLYi, Inc., No. 05-20011 (MFW) (Bankr. D. Del. Dec. 5, 2005); In re Foamex Intl., No. 05-12685 (PJW) (Bankr. D. Del. Oct. 18, 2005); In re Oakwood Homes Corp., No. 02-13396 (PJW) (Bankr. D. Del. July 21, 2003); see also In re Dunmore Homes, Inc., No. 07-13533 (MG) (Bankr. S.D.N.Y. Dec. 20, 2007); In re Granite Broad. Corp., No. 06-12984 (ALG) (Bankr. S.D.N.Y. Feb. 13, 2007).[5]

### B. The Retention of Imperial Is Critical to the Debtors' Success.

36. Denial of the relief requested herein will deprive the Debtors of the assistance of uniquely qualified investment banking and financial advisors and, certainly, would affect an unjust disadvantage to the Debtors and all parties in interest. Indeed, the Debtors would be forced to engage new investment bankers and financial advisors who lack such a thorough understanding of the Debtors' business and the restructuring initiatives that have been implemented over the course of the last few months and which will continue through the pendency of these chapter 11 cases. Hiring a substitute would require the commitment of significant resources to get a substitute up to speed given the steep learning curve involved. Further, comparable investment bankers and financial advisors would charge an equivalent level of fees.

37. The daily pressures of the chapter 11 process generally coupled with the expedited time frame within which the Debtors hope to gain approval of a plan make it highly unlikely that any substitute advisor would be in a position to duplicate Imperial's superior

---

[5] Because of the voluminous nature of the orders cited herein, they are not attached to this Application. Copies of these orders are available on request of the Debtors' counsel.

16

expertise and knowledge of the Debtors' business and operations. In addition, Imperial's prepetition efforts in soliciting investment proposals from multiple third parties uniquely positions Imperial to commence such an expedited process. Accordingly, the Debtors respectfully submit that the services provided by Imperial are critical to the Debtors' estates and request that the Court approve the terms and conditions of the Agreement in substantially the form attached hereto.

### Notice

38. Notice of this Motion has been provided to: (a) the Office of the United States Trustee for the District of Delaware, (b) the Debtors' largest unsecured creditors, as identified in their chapter 11 petitions, (c) counsel to the ad hoc committee of project lenders and (d) any parties requesting notice in these cases pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested, the Debtors respectfully submit that no further notice of this Application is required.

[remainder of this page left intentionally blank]

LEGAL_US_W # 62352060 9
RLF1 3515697v 1

WHEREFORE, the Debtors respectfully request that the Court (a) enter an order substantially in the form attached hereto as Exhibit A, granting the relief requested herein and (b) grant such other and further relief to the Debtors as the Court may deem proper.

Dated: December 11, 2009
Wilmington, Delaware

Respectfully submitted,

**FAIRFIELD RESIDENTIAL LLC**

By: Andrew Hinkelman
Title: Chief Restructuring Officer

**FAIRVIEW HOMES, INC.**

By: Andrew Hinkelman
Title: Chief Restructuring Officer

**FF DEVELOPMENT, INC.**

By: Andrew Hinkelman
Title: Chief Restructuring Officer

**FF PROPERTIES, INC.**

By: Andrew Hinkelman
Title: Chief Restructuring Officer

**FF REALTY LLC**

By: Andrew Hinkelman
Title: Chief Restructuring Officer of FF Properties, Inc., the manager of FF Realty LLC

**FAIRFIELD FINANCIAL A LLC**

By: Andrew Hinkelman
Title: Chief Restructuring Officer of FF Properties, Inc., the manager of Fairfield Financial A LLC

**FAIRFIELD AFFORDABLE HOUSING LLC**

By: Andrew Hinkelman
Title: Chief Restructuring Officer of FF Properties, Inc., the manager of Fairfield Affordable Housing LLC

**FF INVESTMENTS LLC**

By: Andrew Hinkelman
Title: Chief Restructuring Officer of FF Properties, Inc., the manager of FF Investments LLC

**FF DEVELOPMENT L.P.**

*[signature]*

By: Andrew Hinkelman
Title: Chief Restructuring Officer of FF Development, Inc., the general partner of FF Development L.P.

**FAIRVIEW RESIDENTIAL LLC**

*[signature]*

By: Andrew Hinkelman
Title: Chief Restructuring Officer of Fairview Homes, Inc., the general partner of Fairview Residential LLC

**FAIRVIEW RESIDENTIAL WA LLC**

*[signature]*

By: Andrew Hinkelman
Title: Chief Restructuring Officer of Fairview Homes, Inc., the general partner of Fairview Residential WA LLC

**FF PROPERTIES L.P.**

*[signature]*

By: Andrew Hinkelman
Title: Chief Restructuring Officer of FF Properties, Inc., the general partner of FF Properties L.P.

**FAIRVIEW INVESTMENTS LLC**

*[signature]*

By: Andrew Hinkelman
Title: Chief Restructuring Officer of Fairview Homes, Inc., the general partner of Fairview Investments LLC

**FAIRVIEW RESIDENTIAL L.P.**

*[signature]*

By: Andrew Hinkelman
Title: Chief Restructuring Officer of Fairview Homes, Inc., the manager of Fairview Residential L.P.

**FAIRVIEW RESIDENTIAL CA L.P.**

*[signature]*

By: Andrew Hinkelman
Title: Chief Restructuring Officer of Fairview Homes, Inc., the manager of Fairview Residential CA L.P.