# EXHIBIT C

**(Agreement)**

LEGAL_US_W # 62352060 9
RLF1 3515697v 1

March 9, 2009

Fairfield Residential, LLC
5510 Morehouse Drive #200
San Diego, CA 92121

Attention:   Christopher Hashioka
             Chief Executive Officer

Dear Mr. Hashioka:

Pursuant to this letter agreement (this "*Agreement*") Fairfield Residential, LLC (together with its subsidiaries and affiliates, the "*Company*") hereby engages Imperial Capital, LLC ("*Imperial Capital*") as the exclusive financial advisor to the Company in connection with any "*Transaction*" (as defined in this Agreement) or such other services as the Company requires hereunder. For the purposes of this Agreement, a Transaction shall include: (i) a "*Restructuring*", which shall include (a) the consummation of any transaction of series of transactions that effect material amendments to, or other material changes in, any of the Company's debt (the "*Debt*") (including, without limitation, obtaining the requisite consents or acceptances from creditors to an out-of-court restructuring or recapitalization through one or more exchange offers whether under any applicable securities laws or regulations or otherwise or any cash tender offer or any combination thereof); (b) any transaction in which the requisite consent of a reorganization or restructuring are obtained either out-of-court or pursuant to a plan of reorganization (a "*Plan*") pursuant to Chapter 11 ("*Chapter 11*"), Title 11 of the United States Bankruptcy Code (the "*Bankruptcy Code*"); or (c) any other going concern exit from a proceeding under Chapter 11 and/or (ii) a "*Financing*", which shall mean the issuance, whether public or private, of debt and/or equity securities for or on behalf of the Company (whether to raise funds, refinance outstanding Debt or exchange Debt or any combination thereof) or such other financing of any type raised to complete any other Transaction. For the purposes of this Agreement, neither a Restructuring nor a Financing shall include the consummation of the Capmark refinancing transaction that is the subject of the term sheet dated February 5, 2009 (the "*Capmark Transaction*").

Section 1. Services to be Rendered  As advisor to the Company, Imperial Capital may perform the following services as may be requested by the Company: (i) analysis of the Company's business, operations, properties, financial condition, competition, forecast, prospects and management; (ii) financial valuation of the ongoing operations of the Company, provided that Imperial Capital shall not be engaged to appraise or value individual properties owned by the Company; (iii) assisting the Company in developing, evaluating, structuring, negotiating and implementing the terms and conditions of a potential Plan, including the value of the securities, if any, that may be issued to certain creditors and/or the equity holders under the Plan; (iv) assisting the Company in the preparation of solicitation materials with respect to any securities to be issued in connection with the Restructuring (such solicitation materials, including, without limitation, all exhibits, amendment and supplements thereto, the "*Restructuring Offering Materials*"); (v) assisting the Company in the preparation of solicitation materials with respect to the Financing (such solicitation materials, including, without limitation, all exhibits, amendment and supplements thereto, the "*Financing Offering Materials*" and together with the Restructuring Offering Materials, the "*Offering Materials*"); (vi) assisting the Company with the design of any debt or equity securities or consideration to be issued in conjunction with a Transaction; (vii) assisting the Company in communications and negotiations with its constituents, including creditors, employees, vendors, shareholders and other parties-in-interest, including participants in the Plan, in connection with the Plan; (viii) identification of, and assisting the Company in negotiations with qualified participants in the Financing; (ix) providing the Company and its Executive Committee with periodic updates regarding the Transaction; and (x) providing such other financial advisory services with respect to the Company's financial issues as may from time to time be agreed upon between the Company and Imperial Capital

Section 2. <u>Compensation</u>. In consideration for the services to be provided under this Agreement, Imperial Capital shall be paid:

(i) <u>Monthly Advisory Fee</u>. A financial advisory fee of $250,000 per month for the first three (3) months and $150,000 per month thereafter (the "*Monthly Advisory Fee*"), payable monthly in advance during the term of this Agreement The first Monthly Advisory Fee shall be payable upon execution of this Agreement and each subsequent Monthly Advisory Fee shall be payable on the monthly anniversary of the Agreement. Fifty percent (50%) of the Monthly Advisory Fees earned after the sixth (6th) month of the engagement shall be credited first against the Financing Transaction Fee and, to the extent a residual exists, second against the Restructuring Transaction Fee

(ii) <u>Capmark Transaction Fee</u>. A transaction fee of $250,000 (the "*Capmark Transaction Fee*"), payable in cash by wire directly from the proceeds of the Capmark Transaction upon the consummation of the Capmark Transaction

(iii) <u>Restructuring Transaction Fee</u>. A transaction fee of $4,000,000 (the "*Restructuring Transaction Fee*") payable in cash by wire. The Restructuring Transaction Fee shall be payable upon the closing of the Restructuring

(iv) <u>Financing Transaction Fee</u>. A cash fee (the "*Financing Transaction Fee*") payable out of the proceeds of the Financing by wire in an amount equal to (a) 1.0% of the face amount of any secured debt sold or arranged as part of the Financing, (a) 3.0% of the face amount of any unsecured debt sold or arranged as part of the Financing and (c) 5.0% of the face amount of any equity securities sold or arranged as part of the Financing. In the event that any of the debt or equity sold or arranged as part of the Financing is purchased by California State Teachers Employees' Retirement System (together with its affiliates "*CalSTRS*"), in calculating the Financing Transaction Fee, one hundred percent (100%) of debt or equity purchased by CalSTRS shall be credited against the amount of total debt or equity placed in determining the Financing Transaction Fee set forth in this paragraph The total Financing Transaction Fee after applying the credits described herein shall not exceed $4,000,000.

In the event that the scope of the engagement changes during the term of this Agreement, the Company and Imperial Capital shall agree upon a new engagement agreement for the scope of such services

In addition, without regard to whether the Transaction is consummated or this Agreement expires or is terminated, all fees, disbursements and out-of-pocket expenses (the "*Expenses*") incurred by Imperial Capital in connection with the services to be rendered hereunder (including, without limitation, reasonable attorneys' fees, travel and lodging expenses, word processing charges, messenger services, duplicating services, facsimile expenses and other customary expenditures) shall be reimbursed to Imperial Capital, or paid on behalf of Imperial Capital, promptly as billed Imperial Capital shall be paid a cash deposit of $50,000 (the "*Deposit*") against Expenses upon the execution of this Agreement Any unused amounts of the Deposit will be returned to the Company upon demand. Further, the Company shall be responsible for all other expenses associated with the Transaction including, without limitation, its own accounting and attorneys' fees, property appraisal fees, travel and lodging expenses, word processing charges, messenger services, duplicating services, facsimile expenses, printing costs and other expenditures The Company acknowledges that Imperial Capital will not be responsible to reimburse any party for out-of-pocket expenses (including, without limitation, attorney's fees) associated with pursuing and completing a Transaction.

As further consideration, the Company agrees to the indemnification and other obligations set forth in Schedule I attached hereto, which such schedule is an integral part hereof and incorporated herein by reference

All fees and expenses payable to Imperial Capital pursuant to this Section 2 shall be payable in cash via wire transfer to an account designated by Imperial Capital. No fee paid or payable to Imperial Capital or any of its affiliates shall be credited against any other fee paid or payable to Imperial Capital or any of its affiliates. In addition to other remedies that may be available at law or equity, Imperial Capital may stop work should the Company fail to pay Imperial Capital's outstanding fees and expenses within thirty (30) days of receiving an invoice.

The Company shall use its reasonable best efforts to provide for the payment of the fees and expenses set forth in Section 2 hereof in full in any plan of reorganization submitted to the Bankruptcy Court (as hereinafter defined) for confirmation unless this Agreement is replaced after the Chapter 11 filing. Notwithstanding the foregoing, in the event the Restructuring is consummated pursuant to a prepackaged plan of reorganization, the fees payable to Imperial Capital hereunder shall be deemed earned and payable in full and the services of Imperial Capital pursuant to Section 1 hereof shall be deemed completed upon the receipt by the Company of the votes necessary to approve the plan of reorganization (whether through cramdown procedures or otherwise) prior to the filing of the Chapter 11 (as hereinafter defined) case. Additionally, in the event the Restructuring is consummated pursuant to a prenegotiated plan of reorganization, the fees payable to Imperial Capital hereunder shall be deemed earned and payable in full and the services of Imperial Capital pursuant to Section 1 hereof shall be deemed completed upon the receipt by the Company of lock up agreements or other commitments to support a plan of reorganization from the required number of the Company's creditors prior to the filing of the Chapter 11 case. In either of such events, Imperial Capital shall provide during the Chapter 11 case such additional services as are reasonably necessary (including testimony) to confirm and consummate the prepackaged plan, as applicable, without additional compensation.

If the Company becomes a debtor under and the Restructuring is not consummated pursuant to a prepackaged or prenegotiated plan of reorganization, or the fees payable to Imperial Capital pursuant to Section 2 hereof are not deemed earned and payable in full prepetition (for any reason whatsoever), or upon the request of Imperial Capital, the Company shall promptly apply to the bankruptcy court having jurisdiction over the Chapter 11 bankruptcy case or cases of the Company (the "*Bankruptcy Court*") for the approval of this Agreement and Imperial Capital's retention hereunder pursuant to sections 327 and 328 of the Bankruptcy Code and not subject to any other standard of review under Section 330 of the Bankruptcy Code. The Company shall supply Imperial Capital with a draft of such application and any proposed order authorizing Imperial Capital's retention that is proposed to be submitted to the Bankruptcy Court sufficiently in advance of its filing, to provide Imperial Capital with a reasonable opportunity to review and comment thereon. Imperial Capital shall have no obligation to provide any services under this Agreement if the Company becomes a debtor under the Bankruptcy Code unless Imperial Capital's retention is approved under Section 328(a) of the Bankruptcy Code, by a final order of the Bankruptcy Court no longer subject to appeal, rehearing, reconsideration or petition for certiorari, and which is acceptable to Imperial Capital. If the Company becomes a debtor under the Bankruptcy Code and Imperial Capital's engagement hereunder is approved by the Bankruptcy Court, the Company shall pay all fees and expenses of Imperial Capital hereunder as promptly as practicable in accordance with the terms hereof or in accordance with any applicable Order of the Bankruptcy Court. Prior to commencing a Chapter 11 case, the Company shall pay all undisputed amounts theretofore due and payable to Imperial Capital in cash. If applicable, the Company shall also use its best efforts to provide for the payment of the fees and expenses set forth in Section 2 hereof in full in any plan of reorganization submitted to the Bankruptcy Court with the Restructuring Transaction Fee or Financing Transaction Fee payable upon consummation of the Transaction.

Imperial Capital shall invoice the Company for fees and expenses under this Agreement. All fees and expenses payable to Imperial Capital pursuant to this Section 2 shall be payable in cash via wire transfer to an account designated by Imperial Capital.

Section 3  Term and Scope of Engagement. The advisory services and compensation arrangements set forth herein do not encompass other investment banking services such as the exclusive sale or disposition of assets, the raising of capital other than for the purposes of the Financing, the issuance of "fairness opinions", or any other specific services not set forth in Section 1 hereof. The compensation arrangements pursuant to Section 2(i) hereof shall commence effective as of the date hereof and shall continue thereafter on a month-to-month basis pursuant to the terms hereof until the consummation of the Restructuring. This Agreement may be terminated by either the Company or Imperial Capital upon thirty (30) days prior written notice. Upon any termination or expiration of this Agreement, Imperial Capital shall be entitled to receive prompt payment of all unpaid fees and expenses accrued pursuant to Section 2 hereof up to and including the date of such termination or expiration. Sections 2, 3, 5, 6, 9, 10 and 11 of this Agreement and the indemnity and other provisions contained in Schedule I shall remain operative and in full force and effect regardless of any termination or expiration of this Agreement.

In addition, provided that the Company has not terminated this Agreement for cause, if at any time within eighteen (18) months after the termination or expiration of this Agreement the Company enters into a definitive agreement with regard to a Transaction and subsequently consummates such transaction, Imperial Capital shall be entitled to payment in full of

the compensations set forth in Section 2 hereof with respect to such Transaction. For the purpose of this paragraph, "*Cause*" shall mean gross negligence, willful misconduct or fraud

Section 4. Cooperation. To the extent possible, the Company shall: (i) furnish Imperial Capital with all current and historical financial and other information and data regarding the business and financial condition of the Company ("*Information*") as Imperial Capital reasonably believes appropriate in connection with its services hereunder; (ii) provide Imperial Capital with access to the officers, directors, employees and professional advisors of the Company as Imperial Capital reasonably believes appropriate in connection with its services hereunder; and (iii) as applicable, furnish Imperial Capital with the Offering Materials. The Company agrees that it and its counsel will be solely responsible for ensuring that any Offering Materials comply in all respects with applicable law. The Company agrees that neither the Information nor the Offering Materials will contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements therein not misleading in light of the circumstances under which they were made. The Company will promptly notify Imperial Capital if it learns of any material inaccuracy or misstatement in, or material omission from, any Information or Offering Materials theretofore delivered to Imperial Capital. The Company will also cause to be furnished to Imperial Capital at any closing of the Transaction, copies of such agreements, opinions, certificates and other documents delivered at the closing as Imperial Capital may reasonably request.

The Company recognizes and confirms that Imperial Capital, in connection with performing its services hereunder: (i) will be relying without investigation upon information that is available from public sources and upon the Information and Offering Materials supplied to it by or on behalf of the Company; (ii) shall not in any respect be responsible for the accuracy or completeness of such public information, Information or and Offering Materials or have any obligation to verify the same; (iii) shall not conduct any appraisal of any assets of the Company; and (iv) may require that any and Offering Materials contain appropriate disclaimers consistent with the foregoing.

Section 5. Confidentiality. The Company agrees that, unless otherwise required by applicable law, any reference to Imperial Capital in any release, communication, or other material is subject to Imperial Capital's prior written consent, which may be given or withheld in Imperial Capital's sole discretion. Any advice, written or oral, provided by Imperial Capital pursuant to this Agreement shall be treated by the Company as confidential, shall be solely for the information and assistance of the Company in connection with its consideration of the matters set forth in Section 1 hereof and shall not be used, circulated, quoted or otherwise referred to for any other purpose, nor shall it be filed with, included in or referred to, in whole or in part, in any registration statement, proxy statement, offering materials or other communication, whether written or oral, prepared, issued or transmitted by the Company or any of their affiliates, directors, officers, employees, agents or representatives, without, in each instance, Imperial Capital's prior written consent, which may be given or withheld in Imperial Capital's sole discretion; *provided, however*, that the foregoing shall not apply to any information which becomes publicly available other than as a result of the breach by the Company of the undertakings hereunder, or that which the Company is required to disclose by judicial or administrative process in connection with any action, suit, proceeding or claim. In addition, as material condition to entering into this Agreement, Imperial Capital and the Company each acknowledge the Confidentiality Agreement dated November 17, 2008, attached hereto as Exhibit A

Section 6. Conflicts. The Company acknowledges that Imperial Capital and its affiliates may have and may continue to have investment banking and other relationships with parties other than the Company pursuant to which Imperial Capital may acquire information of interest to the Company. Imperial Capital shall have no obligation to disclose such information to the Company, or to use such information in connection with the matters set forth in Section 1 hereof. Notwithstanding the Company's obligation to pay the fees and expenses of Imperial Capital hereunder, to indemnify Imperial Capital and to provide Imperial Capital with Information, the Company recognizes that Imperial Capital is being engaged hereunder to provide the services described above only to the Company and is not acting as an agent or fiduciary of, and shall have no duties or liability to, the equity holders of the Company or any third party in connection with its engagement hereunder. No one other than the Company is authorized to rely upon the engagement of Imperial Capital hereunder or any statements, advice or conduct by Imperial Capital

The Company acknowledges that Imperial Capital or its affiliates may, from time to time, quote a market in or make purchases or sales for their own accounts or the accounts of its brokerage customers in debt or equity securities of or claims against the Company and Imperial Capital's research department may express views or opinions with respect thereto

Imperial Capital has, and agrees to maintain, information barriers between Imperial Capital's corporate finance department and its sales and trading department and research department, pursuant to which Imperial Capital's corporate finance employees are prohibited from disclosing confidential information to Imperial Capital's sales and trading or research employees.

Section 7. Public Announcements. Imperial Capital shall have the right to place announcements and advertisements in financial and other newspapers and journals, at its own expense, describing its services in connection with the Transaction and other services rendered pursuant to this Agreement

Section 8. Exclusivity. The Company agrees that no other financial advisor is or will be authorized by it during the term of this Agreement to perform the same services on its behalf of the type which Imperial Capital is authorized to perform hereunder. No fee payable to any other financial advisor either by the Company or any other entity shall reduce or otherwise affect the fees payable hereunder to Imperial Capital

Section 9. Entire Agreement; Severability; Amendments; Assignments. This Agreement constitutes the entire agreement among the parties hereto related to the subject matter hereof and supersedes all prior agreements or understandings related to the subject matter hereof If any provision of this Agreement is determined to be invalid, unlawful or unenforceable in any respect, such determination shall not affect such provision in any other respect or any other provision of this Agreement, which shall remain in full force and effect This Agreement may not be amended or otherwise modified or waived except by an instrument in writing duly executed by both Imperial Capital and the Company. No waiver by either party of any provision hereof shall be taken or held to be a waiver of any subsequent breach thereof This Agreement may not be assigned by either party without the prior written consent of the other party This Agreement shall be binding upon and inure to the benefit of the Company, Imperial Capital, each Indemnified Person (as defined in Schedule I hereto) and their respective permitted successors and assigns, and no other person or persons shall have the right to enforce the provisions hereof

Section 10. Governing Law; Forum. This Agreement shall be construed, interpreted, governed and applied in all respects in accordance with the internal laws of the State of New York, without giving effect to principles of conflicts of laws. Except for Indemnification claims under schedule I any controversy, claim or dispute relating to this Agreement shall be resolved by binding arbitration in accordance with the rules of the American Arbitration Association pursuant to arbitration conducted in Los Angeles, California Judgment upon such arbitration may be entered in any court having jurisdiction thereof. With respect to claims for Indemnification under schedule I the parties hereby consent to the jurisdiction of any State or Federal Court located within Los Angeles County, State of California. The parties further acknowledge that they waive any right they have or may have to a trial by jury with regard to the claims of Indemnification provided under Schedule I. If any litigation or arbitration shall ensue among the parties in connection with this Agreement or arising out of Imperial Capital's engagement hereunder, the prevailing party shall be entitled to recover from the non-prevailing party or parties its reasonable attorneys' fees and other costs and expenses in connection therewith

Section 11. Counterparts. This Agreement may be executed in one or more counterparts (including by facsimile), each of which shall constitute an original and all of which, when taken together, shall constitute one and the same instrument

Mr. Christopher Hashioka
March 9 2009
Page 6 of 8

Please confirm that the foregoing correctly sets forth our agreement by signing and returning to Imperial Capital the enclosed original copy of this Agreement.

Very truly yours,

IMPERIAL CAPITAL, LLC

By: /s/ Eric Carlson
Name: ERIC CARLSON
Title: MANAGING DIRECTOR

Accepted and agreed as of the date first above written:

FAIRFIELD RESIDENTIAL, LLC

By: /s/ Christopher Hashioka
Name: CHRISTOPHER HASHIOKA
Title: PRES.

Schedule I

This Schedule I is a part of and is incorporated into that certain letter agreement (the "*Agreement*") dated March 9, 2009 by and among Fairfield Residential, LLC together with its subsidiaries and affiliates, the "*Company*") and Imperial Capital, LLC ("*Imperial Capital*").

If the Company commences a case under title 11 of the United States Code, any and all obligations and agreements of the Company under this Schedule I shall be equally applicable to, and binding upon, each of the Company's bankruptcy estates

Because Imperial Capital will be acting on behalf of the Company in connection with the services contemplated by the Agreement, and as part of the consideration for the agreement of Imperial Capital to furnish its services pursuant to the Agreement, the Company (the "*Indemnifying Party*") agrees, jointly and severally, to indemnify and hold harmless Imperial Capital and its affiliates, and their respective officers, directors, partners, members, shareholders, employees, representatives, consultants, advisors and agents and each person, if any, who controls Imperial Capital or any of its affiliates within the meaning of the Securities Act of 1933, as amended, (Imperial Capital and each such other person being referred to as an "*Indemnified Person*"), to the full extent lawful, from and against all claims, liabilities, losses, damages and expenses, or actions in respect thereof, as incurred, based upon, related to, arising out of, or in connection with (i) actions taken or omitted to be taken by the Company and their affiliates, officers, directors, counsel, employees or agents, (ii) actions taken or omitted to be taken by any Indemnified Person pursuant to the terms of, or in connection with, the services rendered pursuant to the Agreement or in connection with any Transaction or proposed transaction contemplated thereby or any Indemnified Person's role in connection therewith, and (iii) any untrue statement or alleged untrue statement of a material fact contained in any of the Information or Offering Materials (each as defined in the Agreement) or omission or alleged omission to state a material fact required to be stated therein to make the statements therein not misleading in light of the circumstances under which they were made, and shall reimburse each Indemnified Person promptly upon demand for any legal or other expenses (including, without limitation, fees and expenses of counsel) reasonably incurred by that Indemnified Person in connection with investigating, preparing to defend, defending against, or appearing as a third party witness, in connection with any such claims, liabilities, losses, damages, expenses or actions; *provided, however*, that the Indemnifying Party shall not be responsible for any claims, liabilities, losses, damages, expenses or actions of any Indemnified Person to the extent, and only to the extent, that it is determined in a final judgment (not subject to further appeal) by a court of competent jurisdiction that such claims, liabilities, losses, damages, expenses or actions resulted directly from the fraud, willful misconduct or gross negligence of the Indemnified Person. No Indemnified Person shall have any liability to the Company, or any of their respective affiliates, officers, directors, partners, members, shareholders, employees, representatives, consultants, advisors and agents in connection with the services rendered pursuant to the Agreement except to the extent, and only to the extent, that it is determined in a final judgment (not subject to further appeal) by a court of competent jurisdiction that such claims, liabilities, losses, damages, expenses or actions resulted directly from the fraud, willful misconduct or gross negligence of the Indemnified Person

Promptly upon receipt by an Indemnified Person of notice of any claim or the commencement of any action, if an indemnification claim in respect thereof is to be made against the Indemnifying Party, the Indemnified Person shall notify the Indemnifying Party in writing of the claim or commencement of such action; *provided, however*, that the failure to so notify shall not relieve the Indemnifying Party from any liability which it may have pursuant to this Schedule I except to the extent, and only to the extent, that it has been materially prejudiced by such failure to so notify; and, *provided, further*, that the failure to so notify shall not relieve the Indemnifying Party from any liability it may have to an Indemnified Person otherwise than pursuant to this Schedule I. If any such claim or action shall be brought against an Indemnified Person, the Indemnifying Party shall be entitled to participate therein and to assume the defense thereof at its expense with counsel reasonably satisfactory to the Indemnified Person. After notice from the Indemnifying Party to the Indemnified Person of its election to assume the defense of such claim or action, the Indemnifying Party shall not be liable to the Indemnified Person under this Schedule I for any legal or other expenses subsequently incurred by the Indemnified Person in connection with the defense thereof other than reasonable costs of investigation; *provided, however*, that any Indemnified Person shall have the right to employ separate counsel in any such action and to participate in the defense thereof; and, *provided, further*, that Indemnifying Party shall continue to be liable for the legal or other expenses incurred by the Indemnified Person in connection with the defense of such action if (i) the employment of such separate counsel has been specifically authorized by the Indemnifying Party in writing, (ii) such Indemnified Person shall have been advised by counsel that there may be one or more legal defenses available to it which are different from or in addition to those available to the Indemnifying Party and in the reasonable judgment of such counsel it

Imperial Capital LLC

is advisable for the Indemnified Person to employ separate counsel (in which case the Indemnifying Party shall not have the right to assume the defense of such action on behalf of the Indemnified Person), (iii) the use of counsel chosen by the Indemnifying Party to represent the Indemnified Person would, in the reasonable judgment of the Indemnified Person, present such counsel with a conflict of interest, or (iv) the Indemnifying Party has failed to assume the defense of such action and employ counsel reasonably satisfactory to the Indemnified Person, it being understood, however, that the Indemnifying Party shall not, in connection with any one such action or separate but substantially similar or related actions in the same jurisdiction arising out of the same general allegations or circumstances, be liable for the reasonable fees and expenses of more than one separate firm of attorneys at any time for all such Indemnified Persons. The Indemnifying Party shall not settle or compromise or consent to the entry of any judgment in or otherwise seek to terminate any pending or threatened action or claim in which any Indemnified Person is or could be a party and as to which indemnification or contribution has or could have been sought by such Indemnified Person pursuant to this Schedule I, unless such Indemnified Person has given its prior written consent to the settlement, compromise, consent or termination or such settlement, compromise, consent or termination includes an express complete and unconditional release of such Indemnified Person.

In order to provide for just and equitable contribution, if any claim for indemnification with respect to claims, liabilities, losses, damages, expenses or actions in respect thereof covered by this Schedule I is found to be unenforceable in a final judgment (not subject to further appeal) by a court of competent jurisdiction or is otherwise unavailable or insufficient to hold harmless an Indemnified Person (except directly due to the fraud, willful misconduct or gross negligence of the Indemnified Person), then the Indemnifying Party shall, in lieu of indemnifying such Indemnified Person, contribute to the amount paid or payable by such Indemnified Person as a result of such claims, liabilities, losses, damages, expenses or actions in respect thereof, in such proportion as shall be appropriate to reflect the relative benefits received and relative fault of the Indemnifying Party on the one hand and the Indemnified Person on the other, as well as any other relevant equitable considerations. The relative fault shall be determined by reference to, among other things, whether any untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by the Indemnifying Party or by the Indemnified Person and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission. The Indemnifying Party agrees that it would not be just and equitable if contributions pursuant to this Schedule I were to be determined by pro rata allocation or by any other method of allocation that does not take into account the equitable considerations referred to herein. No person found liable for a fraudulent misrepresentation or omission shall be entitled to contribution from any person who is not also found liable for such fraudulent misrepresentation or omission. Notwithstanding the foregoing, the aggregate contribution of all Indemnified Persons with respect to such claims, liabilities, losses, damages, expense or actions in respect thereof shall not exceed the amount of fees actually received by Imperial Capital for its services pursuant to the Agreement.

The foregoing indemnity, contribution and expense reimbursement provisions are not exclusive and shall be in addition to any liability which the Indemnifying Party might otherwise have and shall not limit any rights or remedies which may otherwise be available at law or in equity to the Indemnified Persons. These indemnification provisions shall (i) remain operative and in full force and effect regardless of any termination or expiration of the Agreement; (ii) inure to the benefit of any successors, assigns, heirs or personal representative of any Indemnified Person; (iii) shall remain operative and in full force and effect regardless of any investigation made by or on behalf of any Indemnified Person, and (iv) shall be binding on any successor or assign of the Indemnifying Party and each of its successors or assigns.

**Imperial Capital**

2000 Avenue of the Stars, 9th Floor South    Los Angeles, California 90067    TEL 310 246 3700    800 929 2299    FAX 310 246-3794

August 11, 2009

Fairfield Residential LLC
5510 Morehouse Drive – Suite 200
San Diego, CA 92121

Attention:   Mr. Christopher Hashioka
             Chief Executive Officer

Dear Mr. Hashioka:

This letter agreement ("***Amended and Restated Amendment***") relates to the Agreement, dated March 9, 2009 and the amendment dated June 26, 2009 (the "Amendment"), by and between the Fairfield Residential LLC, together with its subsidiaries and affiliates, (the "***Company***") and Imperial Capital LLC ("***Imperial Capital***"). The purpose of this Amended and Restated Amendment is to supplement and modify the Agreement and replace the Amendment. Unless, expressly amended herein, the terms of the Agreement shall remain in full force and effect. The terms of the Amendment shall have no further force and effect. Accordingly, the Company and Imperial Capital agree, as follows:

For avoidance of doubt, the definition of Restructuring shall include a merger, consolidation, or any other business combination, in one or a series of transactions, or a sale involving all or a substantial amount of the business, securities or assets of the Company, or one or more subsidiaries or divisions of the Company, or any transaction structured to substantially achieve the same result.

Section 1. <u>Services to be Rendered</u>. Shall be amended by adding the following to the end of the Section: "Imperial Capital understands that the Company has entered into engagement agreements with other advisors. Imperial agrees that it shall coordinate its services with other advisors and avoid, wherever possible, any duplication of efforts."

Section 2. <u>Compensation</u>. Shall be amended as follows:

(i)     <u>Monthly Advisory Fee</u>. Shall be amended by deleting the last sentence.

(iv)    <u>Financing Transaction Fee</u>. Shall be amended by replacing the Section with the following:

(iv)    <u>Financing Transaction Fee</u>. A cash fee (the "***Financing Transaction Fee***") payable out of the proceeds of the Financing by wire in the event the Company consummates a Financing or series of Financings (x) in an amount up to $85 million, the Financing Transaction Fee shall equal two-thirds (2/3)

of the following; (a) 2.0% of the face amount of any secured debt sold or arranged as part of the Financing, (b) 4.0% of the face amount of any unsecured debt sold or arranged as part of the Financing and (c) 5.5% of the face amount of any equity securities sold or arranged as part of the Financing or (y) in an amount equal to or in excess of $85 million, the Financing Transaction Fee shall be $4,000,000. In the event that any of the debt or equity sold or arranged as part of the Financing is purchased by California State Teachers Employees' Retirement System (together with its affiliates "*CalSTRS*"), in calculating the Financing Transaction Fee, one hundred percent (100%) of debt or equity purchased by CalSTRS shall be credited against the amount of total debt or equity placed in determining the Financing Transaction Fee set forth in this paragraph.

Please confirm that the foregoing correctly sets forth our agreement by signing and returning to Imperial Capital the enclosed original copy of this Amended and Restated Amendment.

Very truly yours,

Imperial Capital

By: *[signature]*

Name:

Title: Managing Director

Accepted and Agreed to
as of the date written above:

Fairfield Residential LLC

By: *[signature]*
Name:
Title: