IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------x
: Chapter 11
:
In re : Case No. 09-14378 (BLS)
:
Fairfield Residential LLC, *et al.*,[1] : (Jointly Administered)
:
Debtors. : **Hearing Date: 2/1/2010 @ 1:30 p.m. (EST)**
:
---------------------------------------------------------------x **Objection Deadline: 1/25/2010 @ 4:00 p.m. (EST)**

## THIRTEENTH OMNIBUS MOTION OF DEBTORS AND DEBTORS-IN-POSSESSION FOR AN ORDER AUTHORIZING THE ASSUMPTION OF EXECUTORY CONTRACTS AND LEASES PURSUANT TO SECTION 365 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 6004 AND 6006

The above-captioned debtors and debtors-in-possession (collectively the "Debtors"), hereby move the Court for entry of an order, pursuant to section 365 of title 11 of the United States Code (the "Bankruptcy Code") and rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), authorizing the Debtors to assume the executory contracts and unexpired leases described in Exhibit A (the "Motion"). In support of the Motion, the Debtors respectfully state as follows:

---

[1] The Debtors are the following 15 entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): Fairfield Residential LLC, a Delaware limited liability company (8277), Fairview Homes, Inc., a Delaware corporation (9930), FF Development L.P., a Delaware limited partnership (2310), FF Properties L.P., a Delaware limited partnership (5355), Fairview Residential LLC, a Delaware limited liability company (5416), FF Realty LLC, a Delaware limited liability company (5941), Fairfield Financial A LLC, a Delaware limited liability company (7014), FF Investments LLC, a Delaware limited liability company (7066), Fairview Investments LLC, a Delaware limited liability company (9605), Fairfield Affordable Housing LLC, a Delaware limited liability company (7111), FF Development, Inc., a Delaware corporation (2308), FF Properties, Inc., a Delaware corporation (5354), Fairview Residential L.P., a Delaware limited partnership (9788), Fairview Residential WA LLC, a Delaware limited liability company (9703) and Fairview Residential CA L.P., a Delaware limited partnership (9972). The mailing address of each of the Debtors is 5510 Morehouse Drive, Suite 200, San Diego, California 92121.

## Jurisdiction and Venue

1. This Court has jurisdiction over this Motion under to 28 U.S.C. § 157 and § 1334. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## Background

2. On December 13, 2009 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of title 11 of the Bankruptcy Code. The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in these chapter 11 cases (the "Bankruptcy Cases").

3. On December 15, 2009, the Court entered an order directing joint administration of these cases pursuant to Rule 1015(b) of the Bankruptcy Rules. On December 23, 2009, the Office of the United States Trustee ("UST") appointed an official committee of unsecured creditors (the "Committee") in these Bankruptcy Cases.

4. Fairfield Residential LLC ("FFR") is a fully integrated multifamily housing company that through its various subsidiaries provides a diverse mix of services to a wide range of investors, joint venture partners and clients. In addition, FFR either directly or indirectly, acts as a general partner or managing member of, and owns varying stakes in, a number of project level operating companies, none of which is a debtor in these chapter 11 cases. In total, the Debtors, along with wholly owned and certain non-wholly owned non-debtor subsidiaries (collectively, with the Debtors, the "Company") have an interest in approximately 200 separate multifamily properties in stages varying from "raw land," to under construction and finally to fully operational new construction and redevelopment communities.

5. With approximately 2,000 employees, the Company currently operates in 40 diverse markets across the United States, including Boston, Massachusetts; Washington,

D.C.; Charlotte, North Carolina; Atlanta, Georgia; Dallas, Texas; Denver, Colorado; Las Vegas, Nevada; Phoenix, Arizona; Los Angeles, California; San Francisco, California; and Seattle, Washington. For 2008, the Company had total revenues of $952.9 million and $107.5 million in net losses. As of December 31, 2008, the Company had approximately $1.2 billion in total assets and approximately $978 million in total liabilities, exclusive of approximately $3 billion of contingent guaranty liabilities. Additional information regarding the Company's financial performance and debt situation is set forth in the Affidavit of Andrew Hinkelman in Support of First Day Pleadings (the "Hinkelman Affidavit").

6. The Company was built around providing a core group of complementary services to its investors and customers, including:

> ***Development and New Construction*** – Relying upon a skilled team of professionals, the Company is one of the largest developers and builders of market rate and affordable multifamily apartment home properties, as well as student housing properties and for-sale condominium homes. Since inception in late 1997, the Company has started over 200 new construction projects consisting of over 68,000 attached homes and representing approximately $8.5 billion in total project costs.
>
> ***Acquisitions and Redevelopment*** – As a core element of its strategy, the Company has a well-defined program of acquiring and redeveloping multifamily properties in markets that are either supply-constrained or in which redevelopment costs are substantially below new construction costs. In addition, the Company has had a strategy focused on acquiring properties in markets that appear to be emerging from economic displacement. Since 1997, the Company has acquired nearly 300 properties, consisting of almost 78,000 attached homes and representing approximately $8.2 billion in project costs.
>
> ***Affordable Housing*** – Since its inception, the Company has been developing, building, redeveloping and managing affordable and workforce housing. The Company is an experienced authority in the intricacies of using Low Income Housing Tax Credits (LIHTCs) and tax exempt municipal bonds to finance affordable apartment homes communities.

- 3 -

The Company has created/ managed over 12,000 affordable apartment homes in over 100 properties throughout the U.S. including almost 6,400 apartment homes in 28 properties financed through Low Income Housing Tax Credits.

*Property Management* – The Company is also one of the largest, full service property management companies in the United States and was ranked by the National Multi Housing Council as the 11th largest apartment manager and 17th largest apartment owner in the country as of year end 2008. As of November 1, 2009, the Company managed over 55,000 apartment homes in new construction, stabilized, turnaround properties and fee-managed properties.

*Asset Management and Disposition* – The Company's internal Asset Management group is responsible for the execution and monitoring of the full business plan of an asset, from the point of acquisition to the sale and realization of the maximum value of the asset and, in turn, the returns to investors. The Company maintains an in-house sales team that, in conjunction with selected brokerage firms, markets and sells properties to maximize the return to the Company's investors.

Since inception, including assets in which it had an ownership interest and those in which it did not, the Company has sold over 360 properties totaling more than 102,000 attached homes for a sales value in excess of $11.7 billion.

7. Historically, the Company's diverse business lines have allowed the Company to pursue a wide range of opportunities and to respond quickly to changes in the real estate and finance markets. Because the multifamily development, construction, lease-up and asset disposition cycles have been complementary, the Company has been able to include each of its business units as part of a comprehensive group of services to its investors focusing on investment profitability.

8. Needless to say, the chaos in the domestic and international real estate and finance markets has had a deleterious effect on FFR and each of its operating businesses. While the demand for multifamily homes remains generally strong and FFR's operating businesses continue to perform well, the Company has become ensnared in the collapse of the real estate finance markets. The unprecedented shuttering of these markets has prevented the Company

- 4 -

from refinancing its significant debt that has matured (or will shortly mature) and has choked off the market for potential purchasers of the Company's properties.

9.  In late 2008, the Company recognized the need to restructure its parent-level debt and began working with the lenders at FFR on an individual basis. By early 2009, those negotiations came to include, both on an individual basis and, later, through a steering committee of project lenders (the "Steering Committee"), those lenders at the non-debtor project level entities who hold contingent guarantees from certain of the other Debtors. These efforts continued throughout 2009, and recently concluded with the Debtors reaching agreement with their core creditor constituencies on the framework of a consensual plan of reorganization that should allow the Debtors to emerge from chapter 11 during early 2010, as one of the leading multifamily home operating companies.

## Relief Requested

10.  By this Motion, the Debtors seek entry of an order, pursuant to section 365 of the Bankruptcy Code, authorizing the Debtors to assume the contracts and leases described in Exhibit A (collectively, the "Contracts and Leases"). As set forth in greater detail below, the Contracts and Leases relate to the Debtors' development and redevelopment construction business. As part of the comprehensive plan designed to ensure that the Projects (as defined below) can continue as scheduled and that equity investors and lenders continue to provide the funding necessary for completion of such projects, the Debtors seek to assume the Contracts and Leases.

## Basis for Relief Requested

11.  Section 365(a) provides that a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease." 11 U.S.C. § 365(a). Courts routinely approve motions to assume executory contracts or unexpired leases upon a showing

that the debtor's decision to take such action will benefit the debtor's estate and is an exercise of sound business judgment. *See Sharon Steel Corp., v. Nat'l. Fuel Gas Distrib. Corp.*, 872 F.2d 36 (3d Cir. 1989); *In re H.M. Bowness, Inc.*, 89 B.R. 238 (Bkrtcy. M.D. Fla., 1988) ("Ordinarily, the decision to assume or reject an executory contract is left entirely to the debtor. Upon proper motion, the court should give perfunctory approval of the decision subject only to review under the business judgment rule."); and *Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pacific R.R.*, 318 U.S. 523 (1943). ("[T]he question whether a lease should be rejected and if not on what terms it should be assumed is one of business judgment.").

12. Courts generally do not second guess a debtor's business judgment concerning the assumption of an executory contract or unexpired lease. *See In re Trans World Airlines, Inc.*, 261 B.R. 103 (Bankr. D. Del. 2001); *Lubrizol Enters., Inc. v. Richmond Metal Finishers, Inc.*, 756 F.2d 1043 (4th Cir.1985); and *In re Health Science Products, Inc.*, 191 B.R. 895 (Bankr. N.D. Ala. 1995) ("The issue thereby presented for determination by the bankruptcy court is whether the decision of the debtor is so manifestly unreasonable that it could not be based on sound business judgment, but only on bad faith, whim, or caprice.").

13. As mentioned above, the Company is one of the largest developers and builders of market rate and affordable multifamily apartment home properties, as well as student housing properties and for-sale condominium homes. In connection with these activities, Debtor FF Development L.P. ("Development") currently acts as developer and/or general contractor for 30 development and redevelopment projects (collectively, the "Projects") of joint ventures in which FFR or another Debtor has a direct or indirect stake.

14. As a consequence of Development's role as developer or general contractor, the executory contracts and leases for the various goods and services needed for the

Projects are entered into by Development rather than the joint venture. Since the actual property is owned by the joint venture entity, however, the investors and secured lenders for any given project fund the joint venture entity itself and the joint venture in turn funds Development for the costs associated with the project.

15. For any given Project, Development typically enters into contracts with building framers, roofers, window suppliers, plumbers, electricians, landscapers, appliance manufactures and many other similarly situated parties. In order to ensure that a project is completed on time and within budget, Development must carefully coordinate the delivery of goods and the schedule for each phase of the project. The slightest delay in the delivery of goods or the completion of a particular task can threaten to disrupt the schedule for the entire project. Thus, it is vitally important that there is no disruption in the schedule.

16. In addition to the aforementioned Contracts and Leases, the Debtors tseek to assume an agreement Development has to serve as general contractor (the "GC Contract") for a project being developed in San Diego County, Califonia by Fairfield Grossmont Trolley LLC ("Grossmont"). In connection with an agreement modifying the loan on the Grossmont project, in order to avoid a default under the applicable construction loan documents, the Debtors must, within sixty (60) days of the Petition Date, obtain Court approval to assume the GC Contract as well as all subcontracts which were not fully performed prior to the Petition Date. Thus, the Debtors must obtain authority to assume the GC Contract and all cubcontracts prior to February 11, 2010.[2]

17. The Debtors have carefully evaluated each of the executory contracts and unexpired leases set forth on the attached Exhibit A. After this careful evaluation, Debtors have

---

[2] The subcontracts related to the Grossmont project were included in assumption motions previously filed with this Court.

LEGAL_US_E # 86489273.3
RLF1 3527968v.1

determined that each of the Contracts and Leases set forth on Exhibit A is (i) at or below current market rates or (ii) the most cost effective means for completing the Projects within the applicable time frame and budget.

18. Although the Debtors believe that the Contracts and Leases set forth on Exhibit A are the most cost effective means of completing the Projects, the Debtors will only want to assume the Contracts and Leases if the applicable lenders to the joint venture entity agree to continue to fund the Projects in accordance with the applicable loan documents and other related agreements for each joint venture entity. So long as such lenders continue to fund the Projects the economic outlay associated with any cure amounts set forth on Exhibit A (the "Cure Amounts") are a net zero for the Debtors' estates with respect to cost outlays and provide income to the Debtors with respect to the various general contractor fees that are paid to the Debtors. While the Debtors believe that the lenders for the various Projects do intend to provide funding for the Projects, to ensure that the Debtors do not assume Contracts or Leases for which there is no source of continued funding for those Contracts and Leases, the Debtors only wish to assume the Contracts and Leases set forth in Exhibit A if the lenders for the applicable Projects provide the Debtors with written confirmation, in a form satisfactory to the Debtors, the Committee and Capmark Finance Inc. that such lenders will continue to fund such Projects through their completion. To the extent that a lender is unwilling to provide such confirmation, the Debtors will file an amended Exhibit A and remove the Contracts and Leases that are associated with any Project for which the lenders have not provided assurance that they will continue the funding for the Project.

19. So long as the lenders will continue to provide funding, the Debtors have determined that in their business judgment it is in the best interests of the Debtors and their

LEGAL_US_E # 86489273.3
RLF1 3527968v.1

estates to assume each of the Contracts and Leases set forth on Exhibit A. The assumption of the Contracts and Leases will ensure that the Projects are completed on time and within the specific budget for such Projects.

### Payment of Cure Amounts

20. Following entry of an order by the Court approving the assumption of the Contracts and Leases set forth on Exhibit A and the passage of the applicable objection deadline discussed below, the Debtors will pay the applicable Cure Amounts to the contract counterparties when such amounts become due and payable pursuant to the terms of the applicable underlying contract or lease.

21. Given that the Debtors are in the middle of a billing cycle with respect to most of the Projects the Debtors do not currently know the exact Cure Amounts owed with respect to the Contracts and Leases set forth on Exhibit A. Accordingly, the Debtors propose that the parties on Exhibit A be required to submit in the ordinary course, but in any event on or before 15 days after entry of an order approving this Motion, a bill to the Debtors that includes all work performed prior to the Petition Date. At periodic intervals, but in all events, prior to making payment to a counter-party, the Debtors shall file a supplemental Exhibit A (each a "Supplemental Exhibit") setting forth the actual Cure Amounts owed to the parties set forth on Exhibit A. Parties shall file any objections to the amounts set forth on the Supplemental Exhibit within 10 days of the filing of each such Supplemental Exhibit. The Debtors shall be permitted to pay the Cure Amounts for the Contracts and Leases set forth in any Supplemental Exhibit for which no objection is received (so long as the applicable lender has provided the acceptable writing agreeing to continue funding the Project to which such contract or lease is related). To the extent that an objection is received with respect to a cure amount set forth in a Supplemental Exhibit, the matter shall be set for hearing on the next regularly scheduled hearing date that is at

least five business days after the objection is filed. To the extent the parties reach an agreement regarding any cure objection, the Debtors shall be permitted to file an amendment to the Supplemental Exhibit indicating the agreed upon cure amount.

### Requests for Immediate Relief & Waiver of Stay

22. The Debtors seek waiver of Bankruptcy Rule 6004(h). Bankruptcy Rule 6004(h) provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise."

23. Although the Debtors were generally current with the obligations related to the Projects as of the Petition Date, various suppliers and tradesmen had provided goods and services in connection with the Projects, but had not yet invoiced the Debtors for such goods and services or the payments for such goods and services had not otherwise become due and payable as of the Petition Date. Accordingly, as of the Petition Date, the Cure Amounts set forth on Exhibit A hereto remained due and owing the suppliers and tradesmen.

24. Given the current economic climate and the particularly severe downturn that has occurred in the construction industry, if the Debtors are not able to immediately assume the Contracts and Leases set forth on Exhibit A, and thereby pay the suppliers and tradesmen who delivered or supplied vital goods and services to the Debtors prior to the Petition Date, it is likely that such suppliers and tradesmen will refuse to deliver or provide any additional goods and services with respect to the Projects. Moreover, the suppliers and tradesmen are entitled to encumber the properties with mechanics' liens for the amounts of any unpaid claims. As the Debtors, in their role as general contractor, are contractually required to remove or otherwise address any liens filed against the properties for construction related items, the aforementioned mechanics' liens will prevent the Debtors from fulfilling their contractual obligations and

- 10 -

earning the full amounts due to them under such contracts.

25. While in some cases the Debtors could find an alternative supplier or service provider to complete the Projects, the time necessary to locate such alternative supplier or tradesmen and then have such alternative supplier or tradesmen deliver the applicable goods and services would jeopardize the entire schedule for completing the Projects. Additionally, the cost associated with using such alternative supplier or tradesmen would greatly increase the cost for such goods and services, thereby reducing the Debtors' profits and the funds available for creditors in these cases. Finally, the failure of the Debtors to make payment for the goods and services provided by the suppliers and tradesmen prior to the Petition Date would likely force some of the suppliers and tradesmen into their own bankruptcy proceeding. Such business failures would require the Debtors to find an alternate supplier or tradesman to complete the remaining contractual obligations and its use of alternate supplier or tradesman would likely result in an increase in the cost to the Debtors for such goods or services.

26. As set forth above, it is necessary for the Debtors to immediately assume the Contracts and Leases set forth on Exhibit A. Immediate assumption of such Contracts and Leases will ensure that the Projects proceed on schedule and in the most cost effective manner possible. Accordingly, the Debtors submit that ample cause exists to justify a waiver of the ten-day stay imposed by Bankruptcy Rule 6004(h), to the extent that it applies.

## Request Pursuant to Bankruptcy Rule 6006

27. To the extent necessary, the Debtors request authority pursuant to Bankruptcy Rule 6006(e) to assume multiple executory contracts or unexpired leases in one motion. Given the emergent nature of the Debtors' need to assume the Contracts and Leases to avoid any disruption to the completion of the Projects, as well as the voluminous amount of Contracts and Leases that need to be assumed, the Debtors require expedited relief and believe

- 11 -

an omnibus motion is the most expeditious manner in which to achieve this expedited relief. Furthermore, the counterparties to the Contracts and Leases will suffer no prejudice due to the use of an omnibus motion. Exhibit A clearly identifies the names of the contract counterparties, the projects to which the Contracts and Leases relate and the commitment identification. Thus, the Debtors submit that it is appropriate to grant the Debtors permission to file an omnibus assumption motion.

## Notice

28. Notice of this Motion has been given to (a) the Office of the United States Trustee for the District of Delaware, (b) counsel to the Committee, (c) counsel to the lenders for each of the Projects, (d) those parties who have requested notice pursuant to Bankruptcy Rule 2002 and (e) the non-debtor parties to the Contracts and Leases.

## Conclusion

**WHEREFORE,** the Debtors respectfully request that this Court enter an Order substantially in the form annexed hereto as <u>Exhibit B</u>: (a) authorizing the Debtors to assume the Contracts and Leases and (b) granting the Debtors such other and further relief as this Court may deem proper.

Dated: January 15, 2010
       Wilmington, Delaware

Respectfully submitted,

/s/ [signature]

Daniel J. DeFranceschi (DE 2732)
Paul N. Heath (DE 3704)
Lee E. Kaufman (DE 4877)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701
Email: defranceschi@rlf.com
      heath@rlf.com

-and-

Richard A. Chesley (IL 6240877)
Kimberly D. Newmarch (DE 4340)
PAUL, HASTINGS, JANOFSKY & WALKER LLP
191 North Wacker Drive, 30th Floor
Chicago, Illinois 60606
Telephone: (312) 499-6000
Facsimile: (312) 499-6100
Email: richardchesley@paulhastings.com
      kimberlynewmarch@paulhastings.com

ATTORNEYS FOR DEBTORS AND DEBTORS IN POSSESSION