IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------x
                                                               :
                                                               :
In re                                                          : Chapter 11
                                                               :
Fairfield Residential LLC, *et al.*,[1]                        : Case No. 09-14378 (BLS)
                                                               :
         Debtors.                                              : (Jointly Administered)
                                                               :
---------------------------------------------------------------x

## DECLARATION OF ANDREW HINKELMAN, CHIEF RESTRUCTURING OFFICER OF THE DEBTORS, IN SUPPORT OF CONFIRMATION OF DEBTORS' THIRD AMENDED JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

I, Andrew Hinkelman, being duly sworn according to law, deposes and says under penalty of perjury:

1.      I am the Chief Restructuring Officer of Fairfield Residential LLC ("FFR") and the other above-captioned debtors and debtors in possession (collectively with FFR, the "Debtors"). In my capacity as Chief Restructuring Officer of the Debtors, I am familiar with the Debtors day-to-day operations, financial condition, books and records, and business affairs.

2.      I submit this declaration (the "Declaration") in support of confirmation of the Debtors' Third Amended Joint Plan of Reorganization under Chapter 11 of the Bankruptcy

---

[1] The Debtors are the following 15 entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): Fairfield Residential LLC, a Delaware limited liability company (8277), Fairview Homes, Inc., a Delaware corporation (9930), FF Development L.P., a Delaware limited partnership (2310), FF Properties L.P., a Delaware limited partnership (5355), Fairview Residential LLC, a Delaware limited liability company (5416), FF Realty LLC, a Delaware limited liability company (5941), Fairfield Financial A LLC, a Delaware limited liability company (7014), FF Investments LLC, a Delaware limited liability company (7066), Fairview Investments LLC, a Delaware limited liability company (9605), Fairfield Affordable Housing LLC, a Delaware limited liability company (7111), FF Development, Inc., a Delaware corporation (2308), FF Properties, Inc., a Delaware corporation (5354), Fairview Residential L.P., a Delaware limited partnership (9788), Fairview Residential WA LLC, a Delaware limited liability company (9703) and Fairview Residential CA L.P., a Delaware limited partnership (9972). The mailing address of each of the Debtors is 5510 Morehouse Drive, Suite 200, San Diego, California 92121.

Code, dated June 14, 2010 [Docket No. 835] (the "Plan"). All capitalized terms used herein and not otherwise defined are used as defined in the Plan. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, or my opinion based upon my experiences, knowledge and information concerning the Debtors' operations and financial condition and the industry as a whole. If I were called upon to testify, I would testify competently to the facts set forth herein. I am authorized by the Debtors to submit this Declaration.

## I. BACKGROUND

### A. Introduction

3. On December 13, 2009 (the "Petition Date"), the Debtors commenced reorganization cases (the "Chapter 11 Cases") by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Court"). The Debtors continue to manage and operate its business as a debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. On December 23, 2009, the Office of the United States Trustee for the District of Delaware appointed a statutory committee of unsecured creditors (the "Creditors' Committee") to represent the interests of unsecured creditors of the Debtor in this Chapter 11 Case.

4. On December 18, 2009, the Debtors' filed a motion to approve the letter agreement by and between the Debtors and FTI Consulting, Inc. ("FTI"), *nunc pro tunc* to the Petition Date [Dkt. No. 84] (the "FTI Retention Motion"). Pursuant to the FTI Retention Motion, the Debtors sought approval from the Court to, among other things, retain myself as the

2

Chief Restructuring Officer of the Debtors. On January 13, 2010, the Court granted the relief set forth in the FTI Retention Motion, *nunc pro tunc* to the Petition Date [Dkt. No. 186].

**B.     The Debtor's Business**

5.     Since its founding a little more than a decade ago, FFR has become one of the largest and most successful multifamily developers and managers in the country. FFR is a fully integrated multifamily housing company that through its various subsidiaries provides a diverse mix of services to a wide range of investors, joint venture partners and clients. In addition, FFR either directly or indirectly, acts as a general partner or managing member of, and owns varying stakes in, a number of project level operating companies, none of which is a debtor in these chapter 11 cases. In total, the Debtors, along with wholly owned and certain non-wholly owned non-debtor subsidiaries (collectively, with the Debtors, the "Company") have an interest in approximately 200 separate multifamily properties in stages varying from "raw land," to under construction and finally to fully operational new construction and redevelopment communities.

    **i.     Certain Events Preceding the Chapter 11 Filings**

6.     Historically, the Company's diverse business lines have allowed the Company to pursue a wide range of opportunities and to respond quickly to changes in the real estate and finance markets. The Debtors' investments in real estate joint ventures have traditionally been dependent upon a steady source of asset-backed financing to complete their new development projects. New construction property investment was typically financed with a three- to five-year construction loan. Similarly, for each acquisition of existing property, financing was obtained through the collateralization of the property itself for approximately five to seven years. Such financing structures were standard in the real estate development industry.

7. The Debtors, like most real estate developers, were particularly dependent upon the ability to either refinance or sell investment properties. Needless to say, the chaos in the domestic and international real estate and finance markets had a deleterious effect on Fairfield and each of its operating businesses. The unprecedented shuttering of these markets prevented the Company from refinancing its significant debt that had matured and choked off the market for potential purchasers of the Company's properties. For example, in the third quarter of 2009, there was an 85% reduction in issuances of commercial mortgage-backed securities from the dollar value for the same time period in 2008 and a 99.1% reduction for the same time period in 2007. While the demand for multifamily homes remains generally strong and Fairfield's operating businesses continue to perform well, the market collapse made it impossible for the Debtors to continue with their normal operations, despite extensive out-of-court restructuring efforts.

8. Concurrent with the collapse of the real estate capital market, property values fell markedly, particularly in Arizona, California, Nevada, and Florida, where the Debtors have numerous multifamily investments. As a result, the Debtors suffered a significant loss in the value of their investment in properties in the past year, in many cases resulting in assets being valued below their loan balances. This decline triggered defaults with respect to the Debtors' investment properties. In some cases, such defaults released the lenders of their obligation to fund any further draws. Furthermore, some equity partners declined capital call funding requests resulting in project level debt defaults. The Debtors' inability to place properties with equity investors, together with the loss in value on the investment properties, caused significant year end write-offs resulting in breaches of certain financial covenants within the core creditor

4

facilities. As a result, as of the Petition Date, the Debtors were exposed to up to $3.0 billion in payment, completion and other guarantees.

9. In late 2008, the Company recognized the need to restructure its parent-level debt and began working with the lenders at Fairfield on an individual basis. In particular, the Debtors proactively sought to: (i) implement cost reductions/cash conservation measures, including, but not limited to, layoffs, overhead cuts, and postponing or foregoing new construction projects, (ii) increase efforts with respect to project sales and refinancings, including, but not limited to, spurring more than $210 million in investment property sales and condominium sales, and (iii) begin negotiations with the Debtors' key stakeholders toward a comprehensive restructuring. These changes enabled Fairfield to substantially maintain its overall cash balance for the first eleven months of 2009.

10. In the fourth quarter of 2008, specifically, the Debtors recognized the critical importance of negotiating with its core creditor constituencies. The Debtors began extensive negotiations with Capmark Lenders[2], in particular, and together with their advisors, began a process to raise new capital. By early 2009, those negotiations came to include, both on an individual basis and, later, through a steering committee of project lenders (the "Steering Committee"), those lenders at the non-debtor project level entities who hold contingent guarantees from certain of the other Debtors. These efforts continued throughout 2009.

11. The negotiations concluded shortly before the Petition Date, with the Debtors reaching agreement with their core creditor constituencies on the framework of a consensual plan of reorganization. The parties projected the Debtors should emerge from chapter 11 during early 2010, as one of the leading multifamily home operating companies. Accordingly, the Debtors

---

[2] Terms not otherwise defined herein shall have the meanings set forth in the Plan.

filed separate voluntary petitions for reorganization under chapter 11 of the Bankruptcy Code on December 13, 2009. On December 15, 2009, the Court entered an order directing joint administration of these cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

### ii. Operations During the Chapter 11 Cases

12. During the first month of these cases, the Debtors successfully stabilized their businesses and effectuated a smooth transition into chapter 11. While the Debtors formulated this plan of reorganization, the Debtors worked earnestly to address the many issues that needed to be resolved, including the following: (a) reviewing thoroughly their business operations and strategies with the assistance of their professionals; (b) ensuring vendor and contractor payments were made in the ordinary course of business; (c) implementing additional operating efficiencies and cost-reduction initiatives; (d) negotiating and obtaining Court approval of agreements to address key morale issues, including employee wages and employee benefits; and (e) negotiating an exit financing arrangement and performance thereunder.

13. The largest pool of creditors in these chapter 11 cases is those with claims arising from guarantees of project-level debt. Throughout these cases, the Debtors maintained open and active communications with the property-level lenders at over 200 properties. By acting as intermediary, the Debtors were able to facilitate negotiations between the various project-level entities and their respective lenders, which led to the restructured or extended loans of over 25 properties. Additionally, the Debtors, through the duration of these chapter 11 cases, negotiated the sale, foreclosure or deed-in-lieu of foreclosure of 12 properties.

14. After the Debtors filed their schedules, which identified the assets and liabilities of the Debtors' respective Estates, the Court entered an order on February 1, 2010: (a) setting

6

March 15, 2010, as the last date by which holders of general prepetition claims against the Debtors could file their Claims (the "General Bar Date"); (b) setting June 11, 2010, as the last date by which governmental entities may file prepetition claims against the Debtors; (c) setting the latter of the General Bar Date, or thirty (30) days after the applicable order, as the last date by which a holder of a rejection damages claim may file a claim; and (d) setting the latter of the General Bar Date, within or twenty (20) days after the amendment, as the last date by which a holder of an amended schedule bar date claim may file a claim (collectively, the "Bar Dates").

15. On or about March 3, 2010, the Debtors filed their First Amended Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code for the Second Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code [Dkt. No. 532] (the "Disclosure Statement"). On March 9, 2010, the Court entered an order (the "Disclosure Statement Order") approving the Disclosure Statement [Dkt No. 543], pursuant to section 1125(b) of the Bankruptcy Code. Furthermore, in accordance with the Solicitation Procedures Order, as defined below, the Debtors caused copies of the Disclosure Statement and other Court approved plan solicitation materials, including ballots, to be sent to creditors, interest holders and other parties in interest in these chapter 11 cases. On June 16, 2010, the Court entered an Order Establishing New (I) Voting Deadline, (II) Objection Deadline and (III) Confirmation Hearing [Dkt. No. 839] (the "New Scheduling Order"). Pursuant to the New Scheduling Order, the deadline to cast votes to accept or reject the Plan was June 28, 2010, and a hearing to consider confirmation of the Plan (the "Confirmation Hearing") is scheduled to be held before the Court on July 6, 2010 at 10:00 a.m. (EDT).

### iii. New Money Investor

16. A necessary and integral component of the Debtors' strategy for emergence from chapter 11 is new financing to, among other things, fund working capital needs of Newco. Accordingly, on January 8, 2010, the Debtors filed a Motion for an Order Pursuant to 11 U.S.C. §§ 105(a) and 363(b) and Federal Rule of Bankruptcy Procedure 6004 Authorizing Debtors' Entry into a Financing Arrangement and Performance Thereunder in Connection with their Plan of Reorganization [Dkt. No. 159] (the "Financing Motion"). Through the Financing Motion and subsequent amendments thereto, the Debtors sought approval to enter into the binding commitment letter dated December 22, 2009 (the "OZ Commitment Letter"), by and among certain of the Debtors, Och-Ziff Real Estate Acquisitions L.P. ("Och-Ziff") and California State Teachers Retirement System ("CalSTRS") to provide the Debtors with the financing necessary to promptly emerge from chapter 11.

17. Following the approval of the Disclosure Statement, the Debtors and the Committee were informed that Och-Ziff had engaged in a series of communications with potential third-party investors (the "Alternate Investors"). As a result of this disclosure and the ensuing investigation, it was agreed that (i) Och-Ziff would step aside as a New Money Investor, (ii) CalSTRS would be relieved of its obligations under the March 5 Agreement and (iii) mutual releases would be exchanged among the parties. On April 19, 2010, the Debtors filed the Motion of Debtors and Debtors in Possession for Entry of an Order Pursuant to Fed. R. Bankr. P. 9019 Approving Settlement with Och-Ziff Real Estate Acquisitions LP [Dkt. No. 688] (the "Release Motion") to seek approval of this agreement. On April 22, 2010, the Court entered an order granting the Release Motion [Dkt. No. 698].

18.     In order to ensure that the Debtors could continue with their plan to emerge from bankruptcy as soon as possible in 2010, the Debtors and the Committee, in conjunction with their respective advisors, immediately began the process of identifying a party to replace Och-Ziff as a New Money Investor. This process was aided by a number of factors, including the extensive new money financing search process that had been conducted prior to the commencement of these chapter 11 cases – which process had continued until the filing of the Joint Plan – as well as the continuing positive performance by the Debtors and certain improvements in the real estate markets.

19.     After receiving expressions of interest from at least nine separate parties, on May 6, 2010, the Debtors filed a Notice of Stalking Horse Replacement New Money Investor [Dkt No. 740], whereby the Debtors stated that Brookfield Asset Management Inc. ("Brookfield") was the highest and otherwise best replacement New Money Investor. The Debtors subsequently filed the Plan which reflected the terms of the binding letter agreement, attached thereto as Schedule 1.

## C.     The Plan of Reorganization

20.     The Plan provides for, among other things, (i) the creation of a new enterprise, Newco, which will purchase and subsequently hold, directly or indirectly, all of the Reorganized Fairfield Assets and (ii) the transfer of certain assets to the FFR Trust for the sole purpose of liquidating the Estates (except for the Reorganized Fairfield Assets) and making distributions to Holders of Allowed Claims and Interests, in accordance with the Plan. The primary objectives of the Plan are to: (a) provide the Debtors with viable capital structures after emergence; (b) maximize the value of the ultimate recoveries to all creditor groups and distribute those recoveries on a fair and equitable basis; and (c) settle, compromise or otherwise dispose of

certain Claims and Interests on terms that the Debtors believe to be fair and reasonable and in the best interests of their respective Estates, creditors and equity holders.

21. An important consideration for the creditors was whether there would be any negative tax implications to the Debtors' stakeholders as a result of the conversion of the Debtors from an LLC to a "C" corporation for federal tax purposes. In order to respond to this concern, the Debtors and their professional and legal advisors performed a valuation of the assets as of the tax conversion date and then compared those values to the estimated values of the assets as of the Effective Date. As a result of this comprehensive analysis, the Debtors determined that the value of those assets is in fact less than the adjusted tax basis of those assets as of the Effective Date for federal tax purposes.

22. Concurrently with the filing of the Plan on June 14, 2010, the Debtors also filed the Plan Supplement, which contained documents relevant to the implementation of the Plan [Dkt No. 837]. The documents contained therein were negotiated with, and the direct result of, extensive discussions with creditor constituencies and include, without limitation, the following:

- Asset Management Agreement. The Asset Management Agreement is an agreement between the entity ("Newco") to be newly formed by the New Money Investors and current Fairfield management, on the one hand, and the FFR Trust, on the other hand, whereby Newco agrees to provide certain management services to the various projects to be owned by the FFR Trust after the Effective Date

- Asset Purchase Agreement. The Asset Purchase Agreement is the agreement whereby Fairfield Residential LLC and FF Properties L.P. agree to transfer ownership of the Reorganized Fairfield Assets to Newco in exchange for $19.25 million and the assumption of various liabilities.

- Expense and Receivable Allocation Agreement. The Expense and Receivable Allocation Agreement is an agreement between Newco and the FFR Trust regarding the allocation of various expenses and receivables as of the Effective Date.

- Guaranty Claims Protocol. This document describes the treatment of the various guaranty claims against the Debtors.

10

- Liquidating Trust Agreement. The Trust Agreement creates and governs the operation of the Fairfield Liquidating Trust.

## II. COMPLIANCE WITH THE BANKRUPTCY CODE

23. Plan Compliance with Bankruptcy Code (11 U.S.C. § 1129(a)(1)). I believe that the Plan complies with the following requirements of the Bankruptcy Code:

24. Proper Classification (11 U.S.C. §§ 1122, 1123(a)(1)). Article II.B of the Plan designates seven Classes of Claims or Interests. I am familiar with the classification of Claims and Interests in the Plan and believe that such classification system is based upon the legal nature and relative rights of the Claims and Interests, and is not proposed for any improper purposes. Each Class contains only Claims or Interests that are substantially similar to other Claims and Interests therein. Additionally, Article II.C of the Plan designates (but does not classify) Claims of the type described in section 507(a)(1) of the Bankruptcy Code (Administrative Claims, including Professional Administrative Claims) and section 507(a)(8) of the Bankruptcy Code (Priority Tax Claims).

25. Specified Treatment of Unimpaired Claims (11 U.S.C. §§ 1123(a)(2)). Article II of the Plan specifies whether each Class of Claims and Interests is Impaired or not Impaired under the Plan.

26. Specified Treatment of Impaired Classes (11 U.S.C. § 1123(a)(3)). Article II of the Plan set forth the treatment of each Class of Claims and Interests.

27. No Discrimination (11 U.S.C. § 1123(a)(4)). Article II of the Plan provides that the treatment of each Claim or Interest in each particular Class is the same as the treatment of each other Claim or Interest in such Class, unless the holder of a particular Claim or Interest has agreed to a less favorable treatment of such particular Claim or Interest.

28. <u>Implementation of the Plan (11 U.S.C. § 1123(a)(5))</u>. Article IV of the Plan and various other provisions of the Plan provide adequate and proper means for implementation of the Plan, including, among other things, a motion by the Debtors for approval of the substantive consolidation of the Debtors, including for purposes of voting, confirmation and distributions to be made under the Plan. In the absence of any creditor objection to the deemed substantive consolidation, and in light of the overwhelming creditor support for the Plan, the deemed substantive consolidation is consensual. Moreover, all of the Debtors are interrelated companies operating under Fairfield Residential LLC. The Debtors utilized extensive intercompany transactions by which cash was payable and receivable between the various Debtors, which is an indicia of the operations of a single enterprise. In addition, there was a commonality of corporate governance at each of the Debtors that are being consolidated. Further, owing to the extensive nature of the guarantee obligations, a significant amount of the Claims against the various Debtors will be duplicative. Thus, the deemed substantive consolidation will promote efficiency and decrease costs in the implementation of the Plan. Thus, the substantive consolidation provided for in the Plan is in the best interests of the Debtors' Estates and creditors.

29. <u>Nonvoting Equity Securities (11 U.S.C. § 1123(a)(6))</u>. The Certificates of Incorporation of Newco will, among other things, prohibit the issuance of nonvoting equity securities.

30. <u>Selection of Corporate Officers and Directors (11 U.S.C. § 1123(a)(7))</u>. The Plan ensures that the selection of the officers and directors of Newco is consistent with the interests of creditors and equity security holders and with public policy. Section 4.D of the Plan provides that the initial board of managers for Newco will have six members, comprised of the following:

(a) four will be selected by the New Money investors (with a total of seven votes); (b) one will be selected by Management (with one vote); and (c) one will be selected by the Trust Oversight Committee (with one vote). The Plan's provisions with respect to the selection of directors and officers are therefore consistent with the interests of creditors and public policy.

31. <u>Impairment of Classes (11 U.S.C. § 1123(b)(1))</u>. Article II of the Plan impair or leave unimpaired, as the case may be, each Class of Claims or Interests under the Plan.

32. <u>Treatment of Executory Contracts and Unexpired Leases (11 U.S.C. § 1123(b)(2))</u>. On the Effective Date, except for any Executory Contract that (i) previously expired or terminated by its own terms, (ii) was previously assumed or rejected by an order of the Bankruptcy Court pursuant to section 365 of the Bankruptcy Code, (iii) is assumed pursuant to this Plan or (iv) is the subject of a pending motion to assume or assume and assign as of the Confirmation Date, shall be deemed rejected pursuant to sections 365 and 1123 of Bankruptcy Code, effective as of the Effective Date. The Plan provides that the Confirmation Order shall constitute an order of the Bankruptcy Court approving such rejection pursuant to Bankruptcy Code sections 365 and 1123 as of the Effective Date.

33. <u>Compliance with Bankruptcy Code (11 U.S.C. § 1129(a)(2))</u>. The Debtors have complied with the Bankruptcy Code in proposing the Plan because (i) the Debtors are proper debtors under section 109 of the Bankruptcy Code and proper proponents of the Plan under section 1121(a) of the Bankruptcy Code, (ii) the Debtors have complied with the applicable provisions of the Bankruptcy Code, except as otherwise provided or permitted by orders of the Bankruptcy Court; and (iii) the Debtors have complied with the applicable provisions of the Bankruptcy Code, including (as set forth above) sections 1125 and 1126(b), the Bankruptcy

Rules, and the Disclosure Statement and Solicitation Order, in transmitting the Solicitation Materials and in soliciting and tabulating votes on the Plan.

34. <u>Plan Proposed in Good Faith (11 U.S.C. § 1129(a)(3))</u>. The Debtors have proposed the Plan in good faith and not by any means forbidden by law. The Debtors have acted in good faith in the negotiation and formulation of the Plan.

35. <u>Payments for Services or Costs and Expenses (11 U.S.C. § 1129(a)(4))</u>. Any payment made or to be made by the Debtors for services or for costs and expenses in or in connection with the Chapter 11 Case, or in connection with the Plan and incident to the Chapter 11 Case, have been approved by, or is subject to the approval of, the Court as reasonable.

36. <u>Directors, Officers, Voting Trustee and Insiders (11 U.S.C. § 1129(a)(5))</u>. In the Newco Operating Agreement, annexed as Exhibit H to the Plan Supplement, the Debtors have disclosed the names and affiliations of each proposed officer and director of the Reorganized Debtor. I believe that the appointment to, or continuation in, office of each of the proposed officers and directors is consistent with the interest of creditors and equity security holders and with public policy.

37. <u>No Rate Changes (11 U.S.C. § 1129(a)(6))</u>. The Plan does not provide for rate changes subject to the jurisdiction of any governmental regulatory agency.

38. <u>Best Interests of Creditors Test (11 U.S.C. § 1129(a)(7))</u>. The Debtors prepared a *pro forma* liquidation analysis based on the unaudited estimated book values of the Debtors' assets as of the Petition Date. The liquidation analysis, annexed as Exhibit C to the Disclosure Statement, presumes an orderly chapter 7 liquidation of the Debtor. The liquidation analysis shows that the estimated value of the Debtor's assets in a chapter 7 liquidation would be sufficient to cover the Debtor's administrative and priority claims; however, even in the best-

case scenario, would leave only a 2.6% recovery for general unsecured creditors in a chapter 7 liquidation. By contrast, under the Plan, general unsecured creditors will receive an estimated distribution of approximately 9.3%. Based on this liquidation analysis, it is clear that the Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code.

39. <u>Treatment of Administrative and Tax Claims (11 U.S.C. § 1129(a)(9))</u>. Pursuant to Article II.C of the Plan, the Liquidating Trustee shall pay each Holder of an Allowed Administrative Claim against any Debtor (excluding Professional Fee Claims) the full amount of such Allowed Administrative Claim, without interest, in Cash, (a) as soon as practicable after the Effective Date but no later than twenty (20) days after the Effective Date, (b) within thirty (30) days after such Administrative Claim becomes an Allowed Claim or (c) when due in the ordinary course. Pursuant to Article II.C of the Plan, the Liquidating Trustee shall pay, at the Liquidating Trustee's discretion, each Holder of an Allowed Priority Tax Claim against any Debtor in full in Cash at the later of (a) as soon as practicable after the Effective Date, or (b) within thirty (30) days after such Priority Tax Claim becomes an Allowed Claim.

40. <u>Acceptance by Impaired Classes (11 U.S.C. § 1129(a)(10))</u>. More than a majority in number and two-thirds in dollar amount of the non-insider creditors in Class 2.A (Capmark Claims), Class 2.B (Fairfield/First Tier Subsidiary General Unsecured Creditors), Class 2.C (Homes General Unsecured Claims), Class 2.D (Fairview L.P. General Unsecured Claims), Class 2.E (Fairview WA General Unsecured Claims) and Class 2.F (Fairview CA General Unsecured Claims) who were entitled to accept or reject the Plan have voted to accept the Plan. Classes 2.A, 2.B, 2.C, 2.D, 2.E and 2.F are the only Class of Claims or Interests entitled to vote on the Plan. Therefore, section 1129(a)(10) of the Bankruptcy Code is satisfied.

41.  **Feasibility (11 U.S.C. § 1129(a)(11))**.  I believe that confirmation of the Plan is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors. The Debtors have analyzed their ability to meet their prospective obligations under the Plan. The projections provided by the Debtors in the Disclosure Statement indicate that the Reorganized Debtors will be financially viable entities in the future. In formulating the Plan, the Debtors, with the assistance of their financial advisors, developed and refined their prepared projections of the Debtors' operating profit, free cash flow and certain other items through fiscal year 2016 (collectively, the "Projections"), all of which are set forth in the Disclosure Statement. The Projections indicate that, after giving effect to confirmation and the consummation of the transactions contemplated by the Plan, the Debtors will have sufficient operating cash to pay interest on all their outstanding indebtedness and to fund anticipated capital expenditures through fiscal year 2016. Further, the anticipated availability of the New Money Investment will provide a sufficient source of capital for the Debtors to meet their financial obligations under the Plan and to fund ongoing business operations. The Projections have been conservatively prepared to enhance the Debtors' ability to maintain cash flow even if economic or other conditions are less favorable than expected. Moreover, as detailed in the Disclosure Statement, the management of Newco is well-qualified to achieve success postconfirmation. Finally, Newco's reasonably projected expenses do not exceed its reasonably projected revenues. Accordingly, I believe that the Plan presents a workable scheme of reorganization and satisfies the requirements of section 1129(a)(11) of the Bankruptcy Code.

42.  **Payment of Fees (11 U.S.C. § 1129(a)(12))**.  All fees under 28 U.S.C. § 1930 presented to date have been paid or provided for, thereby satisfying section 1129(a)(12) of the

Bankruptcy Code. Any fees arising post-confirmation shall be paid in accordance with 28 U.S.C. § 1930.

43. <u>Retiree Benefits (11 U.S.C. § 1129(a)(13))</u>. The Debtor does not have or provide any "retiree benefits" programs, as such term is defined in section 1114 of the Bankruptcy Code.

44. <u>Cram Down (11 U.S.C. § 1129(b))</u>. Based upon my understanding of the terms of the Plan, the Plan (i) does not "discriminate unfairly" with respect to each non-accepting impaired class, (ii) is "fair and equitable" with respect to each non-accepting impaired class, and (iii) has been accepted by at least one impaired class. Classes 1.A, 1.B, 1.C, 1.D and 1.E (Priority Claims) and Classes 4.A, 4.B, 4.C, 4.D and 4.E (Convenience Class Claims) are not impaired by the Plan and are conclusively presumed to have voted to accept the Plan. As attested in the Declaration of Kurtzman Carson Consultants LLC Regarding Tabulation of Votes in Connection with Debtors' Third Amended Joint Plan of Reorganization of Fairfield Residential LLC (the "<u>Voting Affidavit</u>"), Class 2.A (Capmark Claims), Classes 2.B, 2.C, 2.D, 2.E and 2.F (General Unsecured Claims) and Class 3 (Wachovia Claims) have voted to accept the Plan. The Debtor has requested that the Court confirm the Plan pursuant to section 1129(b) of the Bankruptcy Code notwithstanding the deemed rejection of the Plan by Classes 5.A, 5.B, 5.C, 5.D and 5.E (Intercompany Claims), Classes 6.A, 6.B, 6.C, 6.D and 6.E (Subordinated Intercompany Claims) and Classes 7.A, 7.B, 7.C, 7.D and 7.E (Interests and Interest Related Claims) (collectively, the "<u>Rejecting Classes</u>"). With respect to the Rejecting Classes, no claims junior to any of the Rejecting Classes will receive or retain any property under the Plan, and holders of claims in classes senior to any of the Rejecting Classes will not receive payment of more than the allowed amounts of their Claims. Therefore, I believe that the Plan is fair and equitable as to the Rejecting Classes.

17

LEGAL_US_E # 88658221.6

45. <u>Only One Plan (11 U.S.C. § 1129(c))</u>. Other than the Plan (including previous versions thereof), no plan has been filed in the Chapter 11 Case. Accordingly, the requirements of section 1129(c) of the Bankruptcy Code have been satisfied.

46. <u>Principal Purpose of Plan (11 U.S.C. § 1129(d))</u>. The principal purpose of the Plan is not the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933.

Dated: July 2, 2010
      San Diego, California

                                      /s/ Andrew Hinkelman
                                      Andrew Hinkelman,
                                      Chief Restructuring Officer of the Debtors